# Exhibit 4 -
# Deposition of Daniel Boyer

# Exhibit 4

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

HANNAH HALE HOEKSTRA, an individual, ) Case No. 2:24-cv-00392-MMD-CSD

Plaintiff,

vs.

PERSHING COUNTY; DONNA ROBINSON, an individual; DANIEL E. BOYER, an individual; and PAUL ZOHOVETZ, an individual; collectively,

Defendants.

VIDEOCONFERENCE DEPOSITION OF

DANIEL E. BOYER

VOLUME 1 - PAGES 1 - 146

Taken Wednesday, May 27, 2026

At 10:11 A.M.

REPORTED BY: PAMELA PIEHLER, NV CCR-V 974

functions, normal law enforcement functions that are needed at the -- the time that I'm there, and then as well as I have administrative projects and stuff that I work on.

Q. For clarity as well, it's never that crucial a question. Obviously, you're working with Truckee Meadows, you're working with Lyon County. Where do you actually reside, what city?

A. I live in Carson City, Nevada.

Q. Have you ever been suspended or terminated from any law enforcement position?

A. No, sir.

Q. You indicated, with respect to the event in question, and we'll -- we'll talk about the event more specifically just momentarily, that you were functioning on a contract, I believe, or an assignment through Lyon County to Pershing County for your involvement and role at Burning Man in 2012; is that correct?

A. That is correct.

Q. Can you expand on that and explain to me how that process works and -- we'll just leave it at that.

A. Yes, sir. No problem.

So what happens is, Pershing County Sheriff's Office, every year, will send out a statewide letter to all of the law enforcement agencies asking for

roughly two weeks away from my family. And if you've ever experienced the Black Rock Desert, it is harsh, sandy, acidic, destroys your ear, and the pay was not co- -- commensurate with the enjoyment to go spend the time out there anymore.

Q. And your choice to stop going to the Burning -- or, sorry, strike that.

The decision to stop going to the Burning Man events, was that a voluntary choice?

A. Yes, sir.

Q. What about this event made you decide to stop?

A. Burning Man is a very -- On the back side, the operational side of Burning Man, it's a very political event. There are lots of things that occur at Burning Man that are different than normal operations. And after this event, it just was not enjoyable to be there.

Q. What's your opinion of the Burning Man event?

A. I think it's -- I think it's interesting. It is not my particular venue that I would voluntarily go to. I think the art is great, and I think the creativity is -- is pretty cool. It just does not -- it's not something I would participate in for two weeks without a shower or -- or running water or AC.

Q. Speaking of that -- So we'll -- we'll probably get to this in a little more detail later.

Q. Okay. I'm going to have you expand on that in just a moment.
Are you also familiar with NRS 199.280?
A. I don't recall what that is off -- at this time.
Q. Okay. I'll represent to you that one's related to the penalty for obstructing a public officer or resisting a public officer.
So NRS 197.190, what do you understand that to be, and how would you describe the context of that statute?
MS. PARKS: Objec-.
THE WITNESS: That would be --
MS. PARKS: Go ahead.
THE WITNESS: That would be obstruction of a public officer. My understanding of that is anyone who makes false or intentionally misleading statements, who willfully hinders, delays, or obstructs a public officer in the discharge of their official duties. It's a misdemeanor.
BY MR. LAWRENCE:
Q. So you just kind of answered my question.
It is a misdemeanor, not a felony, right?
A. Correct.
Q. In Nevada, what are the appropriate allowances

or context for arresting someone for a misdemeanor?

A. Misdemeanor occurring in my presence and a misdemeanor that will likely continue if it's not handled there.

Q. Okay. You've answered the question before but just to get it on the record clearly. Did you work at the Burning Man event in 2022?

A. I did. Yes, sir.

Q. Do you recall the exact dates of that event?

A. I do not.

Q. Do you know how many days it ran?

A. I believe it's seven days, if I recall correctly. I usually work 7 to 12 days pre and post.

Q. Do you recall -- Sorry. Give me one second.

I'm going to represent to you that the event was August 28, 2022, to September 5, 2022. Does that sound approximately correct?

A. Approximately, yes, without looking myself.

Q. Did you work prior to the event actually starting?

A. I don't recall that year, sir.

Q. Okay.

A. Based on history, it's extremely likely that I -- I did work before and after the event.

Q. Okay. Do you -- do you recall how many days

channels, or do they use distinct channels?
A. I can't speak to Burning Man's operations. I have never known to be on the same channel with Burning Man operational folks.
My knowledge is that all government operations with respect to law enforcement were sharing channels on the 3, 6, and 9. So if you, again, were assigned to one specific area, it was a rotation, you would go from the 3 to the 9.
And then if you were -- There's many different layers to the assignments, but if you were a county person unassigned, you would stay on the 6. If you were with a BLM person, they would have a rotation, so you would just float with their rotation.
So to my knowledge, it was only actual government operations on these frequencies.
Q. If you were dispatched to an event or to -- to an event, dispatch would communicate with you through the appropriate channel based on your location at the Burning Man event; is that fairly correct?
A. Yes, that is fairly correct.
Q. Okay. Okay. We're going to introduce -- I want to transition here to Exhibit 2. This is a single-page document. I can zoom in as needed.
(Exhibit No. 2 was presented.)

BY MR. LAWRENCE:
Q. Do you recognize this document?
A. That appears to be the cover sheet of a Pershing County Sheriff's Office misdemeanor report.
Q. I'm going to zoom in so you can see it a little better. And I'm also just going to kind of scroll slowly through it, and then we'll zoom in on speci- -- specific parts.
Can you read the -- just, generally, can you read all the print on there now?
A. I can, yes, sir.
Q. Okay. I'm going to draw your attention to the lower left. It indicates it's prepared by C115, Boyer, Daniel. Can you see that?
A. I can see that, yes, sir.
Q. And that's you, correct?
A. Yes, sir.
Q. And higher up here we -- towards the top of the screen now, middle of the page, roughly, indicates a suspect, Hoekstra, Hannah; is that correct?
A. That is correct.
Q. So it's your -- is it your understanding that this document relates to the event in question in this -- this litigation?
A. Yes, sir.

Q. And I just want to highlight -- well, it doesn't highlight well.

Upper right shows date occurred August 31st, and time occurred, 1700 or 5:00 p.m.; is that correct?

A. Correct.

Q. Okay. It shows time reported at 18:52, which would be 6:52; is that right?

A. Correct.

Q. 6:52 p.m. to be clear.

A. Correct.

Q. So the net of this document is that there was a misdemeanor -- or Ms. Hoekstra was charged with a misdemeanor, correct?

A. A misdemeanor report was done. As far as what happened after I submitted the report, I don't know that she was charged or not.

Q. Okay. And you -- you prepared this report with respect to the events describing the complaint that is subject to litigation, right?

A. Yes, sir.

Q. At the bottom of the page it indicates that this was approved by Jerry Allen. Is Mr. Allen the Sheriff of Pershing County?

A. Yes, sir.

Q. Okay. Did you submit this report to Sheriff

Q. Does that seem to be correct? I mean, it's your report so I don't want to put words in your mouth, but does that seem to be a correct indication?

A. Based on what you just showed me and highlighted, it does appear that the C means completed.

Q. Okay. And it is for an offense related to 197.190, which is the Nevada Revised Statute for obstructing a police officer, correct?

A. Correct.

Q. Okay. You had responded earlier on your understanding of the elements of that particular statute, and I think you captured it pretty well. I'm going to read it real quickly just so we have it in full context.

"NRS 197.190, Obstructing a police officer. Every person who, after due notice, shall refuse or neglect to make or furnish any statement, report, or information lawfully required of the person by any public officer, or who, in such statement, report, or information shall make any willfully untrue, misleading, or exaggerated statement, or who shall willfully hinder, delay, or obstruct any public officer in the discharge of official powers or duties, shall, where no other provision of law applies, be guilty of a misdemeanor."

I know you don't have it in front of you for a

information required.
From your recollection of the event, do you re- -- is it your allegation that Ms. Hoekstra did any of those things, which is to say, refused or neglected to furnish a statement or report?
A. Not that particular element, sir.
Q. Okay. Do you allege, with respect to this charge, that Ms. Hoekstra made any willfully untrue, misleading, or exaggerated statement?
A. No, sir.
Q. Do you allege that Ms. Hoekstra willfully hindered, delayed, or obstructed any public officer in the discharge -- discharge of official powers or duties?
A. Yes, sir.
Q. We're going to get into the video and obviously look at the specific details, and your own report on this in a second.
But from your recollection, can you specifically describe how Ms. Hoekstra willfully hindered or delayed or obstructed, and who did she delay or obstruct?
A. Yes, sir. Based on the review of my report and my body camera footage, she was dealing with Investigator Robinson at the time, who was attempting to conduct an investigation, and Ms. Hoekstra was hindering

and delaying her from conducting her investigation.
Q. More specifically, those are very broad statements with respect to the language in the statute, how did she actually hinder Ms. -- sorry, Deputy Robinson?
A. So, again, my context is from my report, from what I was told by Investigator Robinson, as well as my observations from a distance.
Investigator Robinson was attempting to access a alleged victim of a sex assault. When she attempted to access her, Ms. Hoekstra exited where the victim was and was trying to get Investigator Robinson to move away and trying to prevent her from talking to the victim.
Q. Okay. Did Ms. Hoekstra ever physically contact or touch Deputy Robinson to your knowledge?
A. To my knowledge, no.
Q. Did she undertake any action to close or bar the entry to the tent where the alleged victim was?
A. From my observation, she was trying to get Investigator Robinson to move away from the area where the victim was.
Q. Okay. So she was talking to her, is that what you observed?
A. She was talking to her, yes.
Q. Prior to your involvement, did Deputy

come back to the top.

(Exhibit No. 3 was presented.)

BY MR. LAWRENCE:

Q. We're going to kind of read through this in a little bit of detail, so I just want to make sure that you can see the whole document in context. Do you recognize --

A. Yes, sir.

Q. -- this document?

A. Yes, sir. That's the narrative to the previous face sheet. Excuse me.

Q. And this narra- -- this two-page narrative was prepared by you, correct?

A. This appears to be my report, sir. My signature would be at the bottom.

Q. Okay. And we'll scroll that just to verify. Lower left, there's an electronic signature indi- -- indicating prepared by C115, Boyer, Daniel. Is that you?

A. Yes, sir, that would be my report.

Q. Okay. And it indicates body camera recorded as well, correct?

A. Correct.

Q. In this context, would that indicate that there was body camera footage for all the events described in

Center, for their side of the operations as well.
Q. In this context, was dispatch, to your understanding, dispatch a -- a Pershing County Sheriff's agent or employee?
A. To my understanding, dispatch is handled by BLM, and they are very similar to how Pershing County does deputies for the event. They are contracted dispatchers who come in for the event, so they would be dispatching for BLM and Burning Man -- or sorry, BLM and Pershing County.
But I couldn't speak to if any of them were normal full-time employees or if they were just contract.
Q. Okay. But to your understanding, they are not Burning Man personnel, correct?
A. Correct. They are not Burning Man personnel.
Q. Okay. Do you recall what channel you received this notification from dispatch on?
A. I do not recall.
Q. Do you have an understanding of why dispatch was unsure of which Zendo location?
A. I do not.
Q. And in this context, it indicates that Black Rock was asking for law enforcement assistance at Zendo. So it was your understanding from the communication

conveyed to you by dispatch that Burning Man personnel or Burning Man employees had asked for law assis- -- law enforcement involvement; is that correct?
A. Correct.
Q. And just to be clear, and I think we've kind of covered it, this communication came to you over the radio you were carrying, correct?
A. Correct.
Q. In the second paragraph, first couple of sentences.
"BLM Ranger Zo -- Ranger Zohovetz and I were in the area of 3 o'clock and C Street in the city. This is close to a Zendo location, we responded."
Can you expand on what a Zendo or a Zendo location is?
A. Yes, sir. Zendo, to my understanding, is a organization that works with Burning Man. The -- From my understanding, they provide mental health and psychedelic support.
The -- the way it was explained to me is if we, or if they, encounter someone who may be hallucinating or having a bad trip, Zendo was there to provide them support, quiet, secure location to let whatever's happening run its course. They had some -- some trained people there and were there to support the participants

of Burning Man.

There are usually two or three, if I recall correctly, locations throughout the city. And it was something where they would go to the scene and bring someone back, or someone could self-report to them, or friends could bring them in there is my understanding.

Q. So it's -- my understanding, and -- and based on your understanding as described, it's more for mental health support, it's not necessarily something associated with crimes or criminal reporting?

A. Correct. It is -- that is correct. However, it is staffed by Burning Man, Black Rock Rangers is what they're called, and their emergency services department staff. So it would be an access point for anybody. Should someone show up there and need something, they would still provide them assistance, get them whatever they needed.

Q. You indicated in the first sentence there that you and Ranger Zohovetz were in that area. Were you paired with Ranger Zohovetz or working in -- as a team with him at that time?

A. Yes, sir.

Q. What was the nature of that partnership with respect to law enforcement? Did you each have distinct law enforcement duties?

A. Due to the nature of the event and all of the overlapping jurisdictions that were involved -- excuse me -- and the amount of people, the lack of solidified infrastructure, law enforcement was paired up with a partner.

Law enforcement, it could be another ranger, it could be another county person. Ranger and I -- Zohovetz and I had worked together for several years and were acquainted with each other. We enjoyed working with each other, so we were always partnered up. But it was not uncommon for multi-agency partnerships.

Q. With respect to any division of law enforcement responsibilities, do you know if those are directed or covered in that 2022 operation plan that we viewed earlier as Exhibit 1?

A. Specific context to that document, I do not know. I do know that there were clear delineations in who handled what based on the BLM's scope of enforcement and our scope of enforcement.

Q. To your knowledge, was the BLM responsible for law enforcement with respect to person-on-person crimes, or was it more associated with property crimes?

A. I've never been trained in their system. I've never worked for their system. I know they have differing laws in how they enforce them.

It was my understanding that the county personnel were handling the person-on-person crimes as the primary. I don't know that that included them from being able to handle these crimes. It was just -- that's how it was.

Q. Okay. The third sentence in that same second paragraph says:

"We arrived on scene and spoke to the Emergency Services Department, ESD Duty Chief."

"We", in that context, is you and Ranger Zohovetz, correct?

A. Yes, sir. We were paired up in the same vehicle together.

Q. Okay. And so you -- so you drove to that site?

A. Yes, sir.

Q. Okay. The Emergency Services Department, the ESD Duty Chief, do you recall who -- her name specifically?

A. I don't recall her name.

Q. Your report goes on to say:

"I informed her that we received a call from our dispatch that ESD and Zendo were requesting law enforcement assistance, but we were unsure of which location. She stated that she did not know of any requests for law enforcement but would ask."

A. Correct.
Q. Is there -- Strike that. Let me think for a second how I want to phrase this.
Was there a process that you're aware of or a protocol by which ESD or Burning Man employees would request assistance from law enforcement?
A. I am not sure of how their operations worked or how they requested it. I just know that we would kee- -- receive dispatches to assist them.
Q. Okay. Prior to the portion described in the first paragraph where dispatch advised you that there was someone looking for law enforcement, had you heard anything on any of the channels of communication with respect to a request by Burning Man for law enforcement assistance?
A. I had not heard anything.
Q. So there wasn't -- to -- just to clarify, there was no open-air communication by Zendo or by Burning Man asking for law enforcement assistance?
A. We did not share frequencies with them.
Q. Okay.
A. So, to my knowledge, this was the only time our dispatch provided us this information. I didn't hear anything else.
Q. Okay.

clarify.

Deputy Robinson, in her first paragraph, indicates, "on August 31, 2022, at approximately 2025 hours." And then she goes from there to describe the events that are part of the report and litigation.

So that's 8:25 p.m. Your report indicates somewhere between 5:00 and 6:40-ish p.m. Do you have a recollection of which of these is accurate?

A. I do not.

Q. Apologies. In the third para- -- third paragraph or second substantive paragraph, it starts:

"I was dispatched to the Zendo site at 3 o'clock and C."

So that's the 3 o'clock location, correct, in C Street?

A. Yes, sir. That would be based off of that clock layout.

Q. She says:

"I met with Deputy Boyer, also assigned as a deputy for Pershing County Sheriff's Office. Deputy Boyer informed me that Zendo and CIT personnel were keeping him from making contact with the victim."

Is that a fair assessment of what you described to her at the time?

A. Yes. Based on my report and seeing her report,

yes.

Q. Was there video of that conversation between you and Deputy Robinson?

A. Based on my recollection, my body -- excuse me -- my body camera does show Deputy Robinson and I speaking. I don't believe there was audio. I believe it was still within the buffer time.

Q. Okay. And that's one of the questions we were going to get to. So can you expand on that as to why there is no sound for that portion only?

A. The body cameras have a buffer time in them, so my understanding is they are always recording but not capturing sound. And so, when you hit the button, it saves the 30 seconds prior to the button click without the sound, and then it starts recording. That's my understanding.

These body cameras were different from the body cameras that I'm normally used to, but I believe they all work the same with a -- with a buffer time frame in them.

Q. Okay. Was there any particular reason you chose to activate the camera when you did during that conversation with Deputy Robinson?

A. If I recall correctly, we start walking towards the fence line. She's going to go inside. So we are

Ms. Hoekstra touch, lay hands on, or otherwise try to physically move Deputy Robinson?

A. From my recollection and from the body camera, I don't believe Ms. Hoekstra ever physically put hands on Deputy Robinson.

Q. So in this context, and from your observation, this is simply an assertion that Ms. Hoekstra asked her to step away from the tent, correct?

MS. PARKS: Objection; asked and answered.

Go ahead, Daniel.

THE WITNESS: From my recollection of the body camera, the best way I would describe it as Ms. Hoekstra would be trying to herd Deputy Robinson away while not making contact with her kind of in trying to get her to move with her.

BY MR. LAWRENCE:

Q. To your knowledge, did Deputy Robinson try to reenter the tent when Hannah came outside?

A. I don't recall that.

Q. Okay. From your recollection of the tent and the scene, was there anything that prevented Deputy Robinson from reentering the tent?

A. Not to my knowledge.

Q. Did Deputy Robinson ever explain to you why she did not go back into the tent?

MR. LAWRENCE: Okay.
BY MR. LAWRENCE:
Q. Yeah. So just for clarity on this. So this is Exhibit 5. It was disclosed on our first supplemental. And the documents, obviously, they'll be attached as exhibits to the deposition transcript later, but it's the BMP 000017 through 19.
And, again, fully cognizant that this is not a document that Deputy Boyer can authenticate.
I just want to ask some questions with respect to her narrative and Deputy Boyer's answers with respect to them.
So I'm just going to read through it, and I'm going to ask you questions about the couple of assertions that she made, particularly with respect to statements that she alleges that you've -- you've made.
So this says, LE Incident Report. I'm assuming Law Enforcement Incident Report, that's my interpretation. It says:
"On August 31 at 6:46 p.m., myself, Virgie R. Merrick, the ESD CIT Duty Chief, along with Hannah Hoekstra and Alisa W., responded to 3" -- I assume 3 o'clock -- "And D Zendo for a potential sexual assault. As we arrived on scene, LE also arrived." Again, assuming law enforcement also arrived. "Deputy Boyer

and BLM Zoltovetz [sic]," -- identified here, but obviously that's referencing Zohovetz -- "Deputy Boyer exited his vehicle, he stated, 'I don't know who called me. I'm tired of being fucking jerked around.'"

Do you recall making that statement?

A. I don't recall making that statement.

Q. Okay. Ms. Duffy continues:

"I introduced myself and advised him I had not contacted LE and did not know who had."

And I'm just going to read it just for context.

"According to CIT/SAT protocol, our guidelines are to talk to the participant/survivor, and if he/she wants to speak with law enforcement, we will notify law enforcement due to federal guidelines referencing anonymous reporting. After speaking with Deputy Boyer, approximately, five minutes later, Investigator Donna arrived on scene."

With respect to the questions about the video earlier, do you recall an interaction with somebody in this context? Is this consistent with your report -- (indiscernible, audio difficulty) -- prior to Deputy Robinson's arrival?

A. Based on my report and my recollection, yes, I did attempt to find out if there was a situation there. So I did speak to somebody.

assuming --

Q. Okay.

A. -- that was the sound coming on.

Q. Okay. Good. And so that comes on at the one-minute mark. And we're getting an echo, so I apologize, (indiscernible, audio difficulty).

You indicated earlier that you thought the buffer was 30 seconds. This, obviously, there's no sound on the video until the one-minute mark after the conclusion of your conversation with Deputy Boyer [sic].

Do you believe that the one-minute is the buffer issue, or is there a way to control the sound and turn it off and on on that body camera?

A. I believe that's a buffer issue. To my knowledge, there's no way to mute the sound on the body camera.

Q. Okay. And I kind of made an assumption with respect to the video, but can you confirm the identity of the person shown in the video that you were speaking with? Is that, in fact, Deputy Robinson?

A. Yes, sir.

Q. Okay. Do you recall the context of your dis- -- Well, strike that.

I under- -- you know -- obviously, you know the context. Do you recall the details of the conversation?

BY MR. LAWRENCE:
Q. The voice we're hearing there, is that you?
A. Yes, sir.
Q. Okay. I want to unpack that a little bit and run through what you were saying there, get some understanding.
A. Absolutely.
(Video plays.)
BY MR. LAWRENCE:
Q. Played back too far, but we'll get there in a second.
(Video plays.)
BY MR. LAWRENCE:
Q. Correct me if I'm wrong. You said, "No, it came over the wall;" is that correct?
A. Yes, sir.
Q. What do you mean?
A. So as earlier we discussed the dispatch center. The dispatch center is a double-wide trailer, if you will. Down the center of it is a pony wall, like a board of four to five-foot-tall wall that would separate cubicles on one s- -- with nothing above it. So it's open air.
One side was our dispatch center, our dispatchers; the other side was the Burning Man Org

dispatchers. So they are in the same room. There is a small partition wall that separates each dispatcher.

And by over the wall, a lot of times, dispatchers will get a request over the wall. Like someone will lean over and go, hey, can you do this? Or they will sometimes hear information that wasn't normally shared with them over the wall.

Q. So in this context you said, I'll tell you exactly -- or I can always rewind and make sure I'm not mischaracterizing -- so I'll tell you exactly where it came from. Somebody leaned over the wall. Are you --

A. Yeah.

Q. So it's your understanding that somebody on the Burning Man side of communications verbally told somebody in law enforcement dispatchment -- dispatch that they were requesting law enforcement. Is that your understanding?

A. My assum- -- that's going to be an assumption. My assumption is that our dispatcher either heard something that tipped her off to this, or someone leaned over the wall and said, hey, we have this going on.

From our understanding, it's a pretty common procedure in that dispatch center. But again, I don't have --

Q. Oh, and that is a point of clarification. When

appear later on the right of the screen, talking to Ranger Reno. Did you recognize him?

A. I believe that was Ranger Zohovetz.

Q. Okay. Thank you.

(Video plays.)

BY MR. LAWRENCE:

Q. Excuse me. So I paused the video. There's a -- it's -- it's distant and it may be really hard to see from your perspective at the moment, but I'm sure you have some familiarity after reviewing the video.

You're looking into the fenced -- the perimeter fenced area, correct?

A. Correct.

Q. There's something that looks like a white chocolate Hershey Kiss in the center of the image with people standing in front of it; is that fair?

A. That is correct.

Q. And that is a yurt or a tent or whatever, but it's your understanding that that is the tent in which the alleged victim was at that time?

A. I believe we'd later come to that based on the movement of people, yes, that she -- they were located in that white Hershey's Kiss looking tent.

Q. Okay. And immediately in front of that, there appear to be four individuals conversing or already

feel that specific people directly involved with this, I -- I have no -- nothing to base a feeling on for Ranger Reno, specifically, but.

Q. But everybody else besides Ranger Reno you would assess as not trustworthy in your opinion?

A. The people that I had direct -- direct interaction with did not strike me as trustworthy and having the best intentions.

Q. Counsel may object to calling for speculation, but you've speculated as to their intentions just in your response. What did you think their intentions were?

A. I don't believe that it's beneficial for accurate numbers to be pub- -- to be reflected in the -- I don't believe that it's beneficial for Burning Man to have accurate numbers be put out as far as what actually occurs at Burning Man in regards to the amounts of sexual assaults that are reported, the amount of crime that actually occurs.

So I -- my opinion is that some of these situations are handled in other ways to prevent official numbers.

Q. Okay. Do you know how many sexual assaults were reported at Burning Man in 2022?

A. I do not.

Is that the portion in which you think the black shirt woman obstructed?
A. And she was not being forthcoming with information.
Q. But she -- she did just tell you there was no request for law enforcement. And from what we discussed earlier, it's equivocal at best if there actually was a request for law enforcement, so.
A. You -- you would be correct.
Q. Okay. All right. Let's -- You still see the video?
A. Yes, sir.
Q. Okay.
(Video plays.)
BY MR. LAWRENCE:
Q. Were you able to hear what you said there?
A. I was.
Q. Okay. And you concluded with, "And someone will go to jail." Is that right?
A. Yes. If they continue to obstruct us. There was more context to it, but, yes, someone could go to jail.
Q. What is the context or statute that supports your legal obligation to investigate this incident?
A. The Sheriff's Office is responsible for

investigating felony crimes in the State of Nevada.
Q. Okay.
A. Within the jurisdiction of that Sheriff's Office.
Q. Is there a distinction from your understanding between responsible and obligation?
A. Yes. One would be that's within their duties; one would be required. I'm not sure exactly how the statute reads on that one, but it is one of the core functions of the Sheriff's Office is to handle felonies.
Q. Okay. Did you have enough information at this point to believe that a felony had occurred?
A. Reports of a sexual assault were what we had. So we were unable to confirm that we had a victim or that it occurred, but we were told that one did occur.
Q. And, again, not to belabor it, but you overheard that one had occurred. Am I correct?
A. Correct. You are correct.
Q. Okay.
A. That is the information I was -- that I was working on at the time.
Q. Okay. And just to be clear, you know, simple question of law, but I want to make sure we're all on the same page, in the context of describing somebody going to jail, if that eventually was the outcome, that

seconds.
Q. We'll try to pinpoint it so we have good clarity here.
(Video plays.)
BY MR. LAWRENCE:
Q. Okay. Okay. There she is, she just came out. So 18:20.
A. Okay.
Q. That's at 18:22, this moment where we can see her body in the yellow shirt, so 40 seconds, I think. So in the 40 seconds you believe she obstructed?
A. Yes. I believe Deputy Robinson had a reason to believe that she obstructed her.
Q. Okay. Was it -- was there any prearranged communication between you and Deputy Robinson that if she waved you in it was for purposes of detention or because obstruction had occurred?
A. As her cover officer, I was to stand back and observe, and so for her dealing with a specific person, and then calling me in was indication that she needed assistance with that person.
Q. Okay. Is Deputy Robinson authorized to detain people?
A. She is.
Q. Had you observed her attempting to detain

Q. And it's your assertion that in this context, she was act- -- Ms. Hoekstra was actively -- actively physically resisting?

MS. PARKS: Object to form.

THE WITNESS: Yes. Based on my training and experience, active physical resistance is push, pull, tense, brace. When I --

BY MR. LAWRENCE:

Q. What did Ms. Hoekstra do?

A. When I put a handcuff on Ms. Hoekstra, she attempted to pull away from me.

Based on my training and experience, having a suspect with one handcuff attached to them pulling away from you, they are attached to that handcuff and that can be used as a weapon based on my training and experience.

So for me to lose control of Ms. Hoekstra with her having one handcuff on would potentially give her access to a weapon.

Q. Let's wind it back and kind of play through that again.

A. Yep.

(Video plays.)

BY MR. LAWRENCE:

Q. Why were you moving Ms. Hoekstra?

A. So our vehicles were outside of that area, and based on the situation that was going on, removing Ms. Hoekstra from the general area there was to not create more unnecessary unstability [sic] there.

So by removing her to the vehicles, for one, was a safe place to secure her. It removed her from the area where Donna Robinson was trying to work, and also put her where my partner was and our vehicles.

Q. It remains your view, then, that handcuffing her de-escalated the situation?

A. Removing her from the situation, in my view, de-escalated her, not handcuffing her.

Q. You -- How far away was that?

A. As -- In a straight line, if we didn't have the fences there, 25, 30 feet by my estimation.

Q. Okay. Deputy Robinson said, "Detain her over there." Was she pointing to the vehicles?

A. She pointed in that direction, yes, sir.

Q. Okay. But you chose to take her to the vehicle, not just 10 feet away?

A. Correct.

(Video plays.)

BY MR. LAWRENCE:

Q. Your statement I heard there was, "You are under my care and control;" is that correct?

A. Yes.
Q. Then why did you agree to loosen them?
A. I feel that sometimes to de-escalate working with people and -- and being empathetic to their needs helps bring the tone down. So if it was something I can do that didn't jeopardize my safety or her safety, I'm happy to do it, to work with her.
(Video plays.)
BY MR. LAWRENCE:
Q. I just want to clarify that Ranger Zohovetz is the one that suggested moving her handcuffs. He's the one that removed her personal belongings from her body, and he's also instructing her here to keep her hands on the vehicle and things. That's all a correct interpretation of the video, right?
A. Ranger Zohovetz suggested the front cuffing, removed the satchel. I believe this is me explaining to her that when I release her hand to go ahead and put it in front of her, I believe everything is correct, except for I believe that's me explaining to her.
Q. Okay. I apologize. I'm going to rewind about 10 seconds, but I think he said I'll just keep it there, but we'll -- we'll address that.
A. Okay.
(Video plays.)

BY MR. LAWRENCE:
Q. Any point in this video that you've seen that's altered, or does this match your recollection with the video of that day?
A. I believe this is a actual factual body cam video from my body cam.
Are we fast forwarding right now, or is this the normal speed of it?
Q. It's just talking.
MR. LAWRENCE: And I apologize, Ms. Piehler, that's probably difficult. I do apologize for that.
BY MR. LAWRENCE:
Q. No, I just want to authenticate the video and make sure that it comports with what you've seen.
We have nine minutes left. We may skip part of it. Let me -- let me kind of look at it, see if we can shortcut this.
A. Back -- back to your earlier question, I could tell you just by the gentleman walking by with the distinct cowboy hat, that was Sergeant John Rogers who arrived on the scene.
Q. Okay. Thank you.
A. There's not many people at Burning Man that wear cowboy hats.
Q. Yeah, he does. I didn't know who he was, but

he is -- I did easily find (indiscernible, audio difficulty).

(Video plays.)

BY MR. LAWRENCE:

Q. Sorry. I didn't want to address this portion of it.

(Video plays.)

BY MR. LAWRENCE:

Q. The video was moving very quickly there, but that was an effort to document the injury she alleges, correct?

A. That is correct, sir. She complained that the handcuffs were too tight, and that I was pulling hard on her arm. So I documented her -- those areas outside of handcuffs after she was released.

Q. Okay. Did you -- Do you recall seeing any red marks, injuries, indentations in her skin?

A. I don't recall seeing anything to that effect.

(Video plays.)

BY MR. LAWRENCE:

Q. What's the predicate for requiring him to identify himself?

A. Well, I don't believe I said he's required to identify himself. I asked to identify him to put him in the report so we have all of his information should this

C E R T I F I C A T E

STATE OF CALIFORNIA )

COUNTY OF SACRAMENTO )

I hereby certify that the foregoing deposition was taken down by me, as stated in the caption; and the questions and answers were reduced to print by me; that the foregoing pages represent a true, correct, and complete transcript of the evidence given on MAY 27, 2026, by the witness, DANIEL E. BOYER, who was first duly sworn by me; that I am not a relative, employee, attorney or counsel of any of the parties; am not a relative or employee of attorney or counsel for any of said parties; nor am I financially interested in the outcome of the action.

This the 11th day of May 2026.

Pamela S. Piehler

_______________________________

Pamela S. Piehler, CCR-V #974

Nevada Certified Court Reporter