# Exhibit 5 -
# Deposition of Donna Robinson

Exhibit 5



NAEGELI
DEPOSITION & TRIAL
(800) 528 - 3335
NAEGELIUSA.COM

Nationwide
COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS

Powerful
LITIGATION SUPPORT

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

HANNAH HALE HOEKSTRA, AN INDIVIDUAL,

Plaintiff,

vs. CASE NO. 3:24-cv-00392-MMD-CSD

PERSHING COUNTY; DONNA ROBINSON, AN INDIVIDUAL; DANIEL E. BOYER, AN INDIVIDUAL; AND PAUL ZOHOVETZ, AN INDIVIDUAL; COLLECTIVELY,

Defendants.

---

DEPOSITION OF

DONNA ROBINSON

TAKEN ON

FRIDAY, MAY 29, 2026

9:00 A.M.

6590 SOUTH MCCARRAN BOULEVARD, SUITE B

RENO, NEVADA 89509

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

**familiar with this provision of the operating agreement at all?**

A. I am aware of this, not the case law.

**Q. Further to that, is it your testimony, then, that you were aware that the tents at Burning Man and at Black Rock City are deemed or considered residences under the law?**

A. These specific tents that were inside Zeno or whatever it's called --

**Q. Zendo.**

A. Zendo. Thank you -- are not considered residences. They're temporary structures for anyone at the event to go and recover from or be separated from other people, but not necessarily people can come and go as they please.

**Q. What's your basis for making the determination that those are -- are not legally residences?**

A. Well, they're only got -- sorry. They only have beds in them for people to temporarily use. And when they're feeling better or recovered from whatever ails them, to include drug usage, they can go back to their normal camp.

**Q. Okay. They are enclosed, though, right?**

A. Yes. Well, yes and no.

A. In relations to these tents or in relations to what is written in the ops plan?

**Q. Both.**

A. Okay.

**Q. And you can tell me which one you're answering first, just so the record --**

A. Okay. So the first one, which would be the tents at Zendo, I do not believe we need a warrant because people come and go and it's open to everyone at the event. Out of courtesy, I would ask -- courtesy to the victim, I would ask if I could come in. If it was an RV or a personal tent, not a public tent, then yes, you would need a warrant or you would need permission.

MR. LAWRENCE: Z-E-N-D-O, in case you're wondering.

THE DEPONENT: Sorry.

MR. LAWRENCE: She's going to ask us all these questions later.

BY MR. LAWRENCE:

**Q. So that Zendo in which all these events occurred, had you been to that particular Zendo in 2022 before this event?**

A. I don't recall if I had been there earlier prior to this incident.

As far as any other Pershing deputies that were contracted, I am -- I do not know.

**Q. Okay. All right. And as we go forward, I will try to remember to call this "the incident". It's -- so there's no confusion between "event," meaning the entirety of the -- the Burning Man event, okay? It'll hopefully help answer -- or keep questions clear.**

**I'm going to have you turn to the next page. I think it's Page 28, Bates stamp number 28. This portion of the policy and procedure relates to audio and video recording.**

**At the very bottom, it says LEOs, Law Enforcement Officers, must audibly record the reason for body-worn camera/MVAR deactivation. In this context, I believe the MVAR is BLM only; is that correct? Or do you know?**

A. I believe that's BLM. I'm not sure. I'm not familiar with that acronym.

**Q. The BWC, that is for body-worn camera, correct?**

A. Correct.

**Q. Okay. At any point on August 31st, 2022, did you deactivate your camera?**

A. I -- I deactivated at the end of the

event. To the best of my recollection, I don't believe I deactivated it during the incident.

**Q. And once the incident's concluded and you're deactivating it, do you audibly record that you're deactivating at that point?**

A. If I remember.

**Q. On the next page, Bates 29, Subsection A there references what you'd talked about, is deactivation at the event or -- or if an encounter has fully concluded.**

**Subsection E of that talks about something else. It talks about, "Mandatory recording circumstance no longer exists." In your understanding with respect to Burning Man policy, what is a mandatory recording circumstance?**

A. Any time we have contact with the public, or in this case, the participants at the Burning Man festival, regarding any type of investigation or police action.

**Q. Were you trained with respect to this in the context of what a mandatory recording event is or was?**

A. I was informed. There was no official-type class.

**Q. Who provided you with that information?**

**Q. Well, speaking of arrests, let's turn to Page 32. At the bottom, there is a section on arrests related to federal arrests and then state arrests. That last paragraph, three lines indicates, "Any state arrest will be conducted by the Pershing County Sheriff's Office. The Pershing County shift supervisor will assist in coordinating investigative efforts with the Pershing County District Attorney. BLM may be requested to assist with transport to the JOC Jail or Pershing County Jail." Did I read that correctly?**

A. Yes.

**Q. Other than transport to JOC or to Pershing County, does BLM -- or BLM staffing have any role in a state arrest?**

A. Only as a cover position if there's not another deputy available. They are -- also could do transports of witnesses or evidence if we don't have the room in our vehicle.

**Q. Okay. Can you expand on what you mean by "cover"?**

A. You have a contact deputy and a cover deputy. So a second law enforcement personnel is there to ensure the safety of the first one.

**Q. If you don't mind, turn to 35. This is**

**officer to submit an SIR to his or her lieutenant. Do you know if a use of force form was created with respect to this incident?**

A. I do not. That is because I was not -- I was not involved in the use of force as far as the actual handcuffing of your client.

**Q. Did you place your hands on Ms. Hoekstra when Deputy Boyer was trying to cuff her?**

A. I did. I grabbed her other arm so that she could not use it as a -- in any way against Deputy Boyer and to assist him in the handcuffing.

**Q. Does that control over Ms. Hoekstra's arm constitute use of force?**

A. Not usually.

**Q. What's the distinction between controlling her arm versus actually placing the cuffs as far as use of force?**

A. Normally -- so you're getting into two different definitions here. Use of force is any force used to handcuff or subdue a subject, to include handcuffing. However, the use of force form that they're talking about usually is in relation to a claimed or visible injury. It's an additional form in addition to the police report or the -- the crime report.

Introduce Exhibit 3.

THE REPORTER: Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for identification.)

MR. LAWRENCE: James, this is Mrs. Robinson's -- sorry, Ms. Robinson's supplement to the misdemeanor report.

Apologies again.

BY MR. LAWRENCE:

**Q. Can you look at this document and just let me know if you recognize it?**

A. I do.

**Q. And can you tell me what it is?**

A. It is my supplement narrative on this incident.

**Q. Indulgence for a second while my computer decides to work or not. That's your electronic signature in the lower left, right?**

A. Correct.

**Q. The date indicates September 3rd, 2022; is that right?**

A. Correct.

**Q. Would that be the date you created this supplement?**

A. Correct.

**Q. Is there any reason it wasn't created sooner?**

A. It's possible that just depends on how busy I was, as far as when I had time to actually sit down and type this.

**Q. Do you recall how busy you were at that year's event?**

A. We're always busy. As far as the individual calls, no.

**Q. In your first line of your report -- sorry, first paragraph of your report, last sentence, you indicate, "I was dispatched to a possible sexual assault." We've covered some of this earlier, but you don't recall who dispatched you, correctly?**

A. Correct.

**Q. The language that you've indicated there specifically is, "I was dispatched."**

A. Correct.

**Q. Were you specifically dispatched?**

A. Yes. I was requested and sent.

**Q. And that was by the dispatch officer?**

A. To the best of my recollection, yes.

**Q. Again, this is a point of interest or dispute, and it's going to be addressed in the**

**her, the victim."**

**Did you have consent to stick your head into the first tent?**

A. No.

Sorry.

MS. PARKS: You're okay. Go ahead.

BY MR. LAWRENCE:

**Q. In your view -- and I think you addressed this earlier, but in your view, did you need consent to enter the tent?**

A. No.

**Q. And why did you ask?**

A. Out of respect.

**Q. As we'll get to in the video, Ms. Hoekstra told you that the victim didn't want you to enter, but you obviously didn't accept Ms. Hoekstra's assertion. Why did you not go ahead and enter?**

A. I couldn't get in initially because she was physically blocking the door, the entrance way to the tent. Once I asked her to step out, she continued to argue with me and try to get me away from the tent. Without traumatizing the victim, I didn't -- I was trying to be courteous.

**Q. Okay. When you say Ms. Hoekstra was blocking the door, just because she was present in**

**the tent or was she actively precluding you from entering?**

A. She was actively precluding me from entering.

**Q. How so?**

A. So the opening was a round opening, and as I tried to look into the tent, her body was right there at the entrance of that opening.

**Q. Where was she -- I'm sorry. Do you have any knowledge of where she was prior to you looking in?**

A. No.

**Q. It's possible that that's where she was the entire time?**

A. I don't believe so because other people had been going in and out of the tent.

**Q. To your knowledge, was Ms. Hoekstra aware that you were there?**

A. Yes.

**Q. How?**

A. One of the Zendo volunteers had gone in and told them that I was there.

**Q. To your knowledge, was Ms. Hoekstra aware that you were going to try to enter the tent?**

A. I don't know what her knowledge or her

thought process was.

Q. But yet, you believe she was intentionally blocking you from entering?

A. I do.

Q. Do you think those answers are consistent? In one instance you know what she was doing, in the other you don't?

A. I know what she was doing. I don't know what she was thinking. I can't read her mind.

Q. A few sentences below that, let me just read through it because it's easier -- trying to find a sentence. "Immediately, the CIT person later identified as Hoekstra, Hannah, told me that they were going to pass on that. I informed her I needed to hear that from her(the victim). Hannah said she was asked to talk on her behalf. I informed her I needed to hear from her that she did not want to talk to me."

Why did you need to hear that from the victim?

A. Because it's the victim who either can decline -- it's their right to decline or want to report a sexual assault. A third party or second party cannot be their voice in that aspect. I need to hear it from the victim. I have had other cases

comes out and says, well, she doesn't want to talk to you, and that's maybe not the case, I don't want to be put in a bad position later.

**Q. Okay. I'm expanding on that, and apologies if you feel like you answered the question. I understand that to be your interpretation and analysis of her being the one to say she doesn't want to do it, that only -- she is -- she's the only one authorized to do so. What I'm trying to understand is what legal imprimatur or what legal force requires you to ask.**

**In your knowledge, is there a statute that instructs, as part of your job as a law enforcement officer, to ask the question if the victim does not want to volunteer?**

A. So, as my duties as a law enforcement officer, it is my responsibility to investigate a crime when it is reported to me. So, based on that experience, as well as my understanding that it is the victim of a sexual assault is the only one that can decline a report, that's what I was going off of.

**Q. Okay. Is there -- in your understanding of your duty, as you -- as you've just articulated, to investigate a crime, the victim was present in**

**the tent. Is there either -- is there a statute that instructs that you must do it immediately or with urgency?**

**I'll put in some context. I'm not sure. I think her name is Kate in the -- in the video. She talks about the idea that there was an agreement that these kind of incidents would be reported and then the victim potentially would report to -- to law enforcement within 24 hours. In the context, you were -- of the video, as we'll see shortly, you were not amenable to waiting 24 hours. Is there a statute that directs you to get that answer to that question immediately, or are you allowed to wait?**

A. To the best of my knowledge, there is not a statute. However, what Kate was discussing in the video, I was not privy to. That was a discussion well above my pay grade. And I am an investigator investigating a crime that was reported to me right then and there.

**Q. Was there any risk of flight for the -- from -- with respect to the victim?**

A. Well, the victim would have been more difficult to locate or if later -- which I have had victims come up to me later to report their crimes, having to -- the fact that Burning Man is such a

transient city, that once the event's over, people go to all corners of the world.

**Q. At that point, do you know if the victim had been identified? Had Burning Man staff procured her name or contact information?**

A. Not to my knowledge.

**Q. Okay. I'm going to address some of it now because it comes up, obviously -- some of the things that you've articulated to me now are some of the things -- same things that you address in the video, particularly with respect to this case in Sparks, is how you've described the case. And obviously, Sparks I'm assuming to mean the suburb here of Reno, right?**

A. Sparks, Nevada.

**Q. Do you know the case name, number?**

A. I do not.

**Q. Okay. Do you recall the year?**

A. It was during my tenure at Reno PD because it was discussed at length in briefings. But the exact year on -- right now, I do not have that.

**Q. Okay. As I'm understanding your description of the case, it sounds like it was a civil lawsuit against a law enforcement agency for refusing to accept a report from an assault victim;**

A. No.

**Q. Again, why was Ms. Hoekstra the tipping point for this activity?**

A. She -- because she continued to hinder me. I had been more than patient with the whole process by letting this go for, like, almost 20 minutes. And at the fact that she was starting to become argumentative with me about moving away from the tent, and I told her no. And at that point, it was like, okay, you're going to be detained. I called Deputy Boyer over.

**Q. How long -- how long do you think you interacted with Ms. Hoekstra before you ordered her to be handcuffed?**

A. Personally, was -- was probably a few minutes.

**Q. All right. And in that interaction, you mean you had -- you think you had spoken with her for a few minutes?**

A. Correct.

MR. LAWRENCE: Okay. We'll get to some of the other stuff in the video.

Exhibit 4.

THE REPORTER: Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for

**Q. What did you mean?**
A. We had already been dispatched to two sexual assaults at this location.
**Q. And that means that you can't wait for CIT to speak to them?**
A. They had already been speaking to them. Normally, I try and, out of courtesy, give them some time. And as you can see by the video, I am -- I give them more than enough time. And I have no idea how long they had been on scene.
**Q. Do you believe -- how long after you received the dispatch did this start?**
A. Honestly, I don't know because I don't know where I was responding from. I could have been responding from the JOC, which takes several minutes to get there, or I could have been on another location in the city. I don't recall exactly where I was.
**Q. Point of clarification on that. If you were at the JOC, is it possible that dispatch spoke to you directly?**
A. No, it would have been over the radio.
**Q. It was over the radio? Okay.**
(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. Just a quick question. We didn't fully authenticate that. Do you recognize this video?**

A. I do.

**Q. Is it your body camera footage?**

A. It is.

**Q. From August 31st, 2022?**

A. Correct.

MR. LAWRENCE: Okay.

(WHEREUPON, Exhibit 6 was played for the record.)

MR. LAWRENCE: James, can you -- yeah. James can't hear us. I think I need to unmute my mic on the Zoom. How about now? Is that better? Can you hear?

MR. SWEETIN: I can hear something very slight. I can't really hear it.

MR. LAWRENCE: Okay. It should be picking me up through the mic on my computer. I don't know if you guys can hear me or not.

MR. SWEETIN: Okay. I can hear you now.

MR. LAWRENCE: Okay. I apologize. Our apologies for that. So we're going to start with the video. I'm asking questions every time it gets paused --

BY MR. LAWRENCE:

**Q. Were you exasperated at this point?**

A. I have asthma, so sometimes I breathe heavy.

**Q. Okay.**

A. And I will -- I'm not proud to admit this. I was overweight back then.

MR. LAWRENCE: Okay.

(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. Based on your statement there, you were frustrated?**

A. I was frustrating on how long this was taking. I wasn't frustrated with any specific person at this point, just the fact that this is taking a while and it appeared that they were hindering my investigation.

If I had been able to speak with the victims and they didn't want to speak to me, I would have been gone within less than five minutes. And we're already going into 16 minutes at this point. Having deputies and BLM rangers tied up on this call keeps us from going to other calls for service.

**Q. Were there any other calls for service --**

A. Yes.
**Q. How?**
A. By not letting me talk to the victim, by physically putting herself between me and the victim at the entrance of the tent, and trying to pull me away from the tent.
**Q. Okay. Ms. Hoekstra was already in the tent, right?**
A. Correct.
**Q. There was no other exit for her to leave the tent, was there?**
A. No. Not that I'm aware of.
**Q. How would she have exited the tent without going through the doorway?**
A. Well, when she came up to the door, when I asked if I could come in, she had placed herself between me and the victim.
**Q. You were trying to talk to Ms. Hoekstra, correct?**
A. I was trying to talk to the victim, and then she came to the door and blocked it. And at that point, because she was starting to argue with me, I asked her to step out of the -- the tent.
**Q. In your understanding of things, how long had she blocked the doorway?**

A. Correct.

**Q. Okay. Had Ms. Hoekstra complied with your instructions to this point?**

A. To get out of the tent, yes. To -- she continued to argue with me.

**Q. In your view, is arguing obstruction?**

A. The fact that she had been in the tent since the beginning of this video, which was now almost 19 minutes, and the -- the fact that she knew that I was already outside, and the fact that she kept delaying by allowing me to come in through other people, and when I put my head at the entrance, and then this behavior, I didn't want to -- at this point, it was, yes, it was enough.

**Q. Do you know what Ms. Hoekstra was doing in the tent?**

A. Just talking to the victim.

**Q. Isn't that her job?**

A. Yes. But she also knew I was there.

**Q. Did she have any obligation to come talk to you?**

A. I didn't need to talk to her. I needed to talk to the victim. But she kept telling the other volunteers that they wanted to finish their interview first, that -- it kept dragging out, which

is a hindrance to my investigation, as well as when she came out of the tent trying to pull me away verbally, but arguing with me. At that point, she's still hindering my investigation, and she needed to be detained and removed from the immediate area.

**Q. What -- what was the next necessary step in your investigation?**

A. Speak with the victim to find out if she wanted to speak with me, from her own self.

**Q. In the video as we see it here, is Ms. Hoekstra blocking the tent?**

A. No.

**Q. Why did you not turn around and simply go in and talk to the victim?**

A. Because when you have somebody that is being argumentative with you as a law enforcement officer, you don't turn your back on them. And I was there alone in that immediate area.

**Q. Okay. But do you consider disagreement a threat?**

A. In my experience in law enforcement, when I've had people be argumentative with me, they could potentially escalate to being a threat, yes.

**Q. Have you ever been physically assaulted by someone you were detaining?**

**Q. All right. What was your -- we've addressed this a little bit before in -- in analyzing the law, but what was your official power or duty with respect to requiring that victim to speak to you?**

A. I was investigating a felony that was committed in the State of Nevada, in Pershing County.

**Q. Again, what does it have to do with forcing the victim to speak to you?**

A. I wasn't going to force the victim to speak to me, but I needed to speak to her to make sure that she did not want to make a report.

**Q. Okay. Did she speak to you voluntarily?**

A. After your client was detained.

MR. LAWRENCE: Okay. We'll get to that.

(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. Is that your arm on Ms. Hoekstra?**

A. On her --

**Q. Sorry. Is that your hand on her arm? Sorry.**

A. That is my hand on her left upper arm.

MR. LAWRENCE: Okay.

BY MR. LAWRENCE:
**Q. A couple questions. Did you -- did Ms. Hoekstra ever physically touch you?**
A. No.
**Q. Once Ms. Hoekstra exited the tent, did she ever position herself between you and the tent?**
A. No.
**Q. Other than talking to her -- talking to you and trying to get you to step away from the earshot of the victim, did she ever do anything to force you to leave or to move away?**
A. Blocking my vision to see where the victim was when she was first at the entrance of the tent. The fact that she kept arguing with me. I wouldn't really say it was talking. It was more she was arguing with me and trying to pull me away from the tent verbally. That was enough for me to believe and -- and have probable cause that she was delaying and hindering my investigation.
**Q. Did you have any obligation to follow her away from the tent?**
A. No.
**Q. Then it didn't prevent you from doing what you needed to do, did it?**
A. Like I said earlier, I was in there alone,

**said there were two SA reports?**

A. Correct.

**Q. Marginally correct? In that context, you didn't say that the victims had asked for law enforcement assistance?**

A. I have no --

**Q. Is that an -- sorry about that. Is that an oversight in this context, or was it your recollection that all there was was two reports of a sexual assault?**

A. My recollection was that we were dispatched by dispatch to two sexual assault victims being reported at this location.

**Q. Okay. Okay. I appreciate that. And that's a good clarification. Do you have any specific recollection that, as part of that dispatch, there was any indication to you that the victims had asked for law enforcement to attend?**

A. I have no knowledge of that.

MR. LAWRENCE: Okay.

(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. What do you mean in the context of they're trainees?**

A. To the survivor or victim.

Q. Okay. In NRS 178A.170, it says, a survivor has the right to consult with a sexual assault victims' advocate during and in any interview by a law enforcement official or prosecutor. Is that your understanding of the law as well?

A. Read that one more time.

Q. Survivor has the right to consult with a sexual assault victims' advocate during, one, any forensic medical examination, and any interview by a law enforcement official or prosecutor.

A. If they choose.

Q. Okay. In this context, did you believe or disbelieve that Ms. Hoekstra was acting under NRS 178.170 as her sexual assault victim's advocate?

A. As an advocate for support, she does not have the right to speak on the victim's behalf to law enforcement.

Q. Okay. NRS 178.170, Part 2, says, "A survivor has the right to designate an attendant to provide support during any interview by a law enforcement official or prosecutor."

A. All right. Support.

Q. Okay.

A. That means support, being there with her, holding her hand. It does not give them -- nowhere in that law does it state that they can speak on their behalf --

**Q. Okay.**

A. -- with law enforcement.

**Q. Fair enough. Why did you tell Ms. Hoekstra to step -- if she was the victim's advocate, why did you tell her to step away?**

A. I asked her to step out of the tent because she was arguing with me and I didn't think it was appropriate to do that in front of the victim.

**Q. Even though she was advocating for the victim?**

A. Correct.

(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. So your statement there is, "She can't get argumentative with us," correct?**

A. To hinder our investigations.

**Q. I'm just trying to get the words. "She can't get argumentative with us," correct?**

A. Correct.

MR. LAWRENCE: I'm just trying to work through it quickly for everybody. It has a lot of stuff here that's not relevant.

(WHEREUPON, Exhibit 6 was played for the record.)

BY MR. LAWRENCE:

**Q. It's called obstructing and resisting? Is that what you said earlier?**

A. Well, yeah, there's obstructing, and there's resisting. She was passively resisting when we were trying to handcuff her.

**Q. Resisting what?**

A. Our orders and pulling away from Deputy Boyer. That's why I went and put hands on her other arm.

**Q. The common terminology is "resisting arrest." Is that what you were talking about or no?**

A. Yes.

**Q. Okay.**

A. Well, resisting a public officer is actually what it says.

**Q. Okay. Is that codified in statute?**

A. I would have to look at the statute exactly.

**Q. Okay. There was no resisting charge**

CERTIFICATE

I, Brittany Douglas, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 16th day of June, 2026.

Brittany Douglas, CER No. 4235