# Exhibit 6 -
# Deposition of Hannah Hoekstra

**Exhibit 6**

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-o0o-

HANNAH HALE HOEKSTRA,
an individual,

Plaintiff,

vs. Case No. 3:24-cv-00392-MMD-CSD

PERSHING COUNTY; DONNA
ROBINSON, an individual;
DANIEL E. BOYER, an individual;
and P. ZOHOVETZ, an individual;
collectively,

Defendants.

________________________________/

Pages 1 to 192, inclusive.

ZOOM DEPOSITION OF HANNAH HALE HOEKSTRA

_________________________

Monday, June 1, 2026

REPORTED via Zoom BY: TINA M. DALPINO
CCR #641 (Nevada)
CSR #11883 (California)
Veritext Legal Solutions
Job No 7994434

course, living in California I heard about Burning Man. I really knew nothing about it. I'm not a festival-goer. I went out of curiosity. I went by myself. I got in my car and drove there. And soon after I arrived, I met some very nice people and they knew that I had done nursing and forensic work.

And Burning Man has their own people out there that they call "rangers," and one of the rangers told me that there was perpetrators -- known perpetrators coming back year after year and they were suspected or known, or even in some cases, convicted of sexual assault.

I was -- I was at that event for the first time for four days, and on the second day after I found this out, I sought out the Crisis Intervention Team, which I volunteer for and which I was working for the day of August 31, 2022, or working with.

And I found the -- the lady that organizes that Crisis Intervention Team. Her name is Anna Duffy. And I told her I wanted to be part of the solution and wanted to be on her team.

And she -- she said she'd consider it, and then I went home and then I heard back from her later. That's how I became your atypical person that goes to Burning Man.

Q And that was in -- that was in 2015 when you first went and you went for four days, correct?
A You phased out a little bit, but I believe you said that was in 2015.
Q I mean, 2015.
A Yes.
Q And you went for four days, correct?
A Yes.
Q And then you began -- you met some people there that were also volunteers for Burning Man. Is that correct?
A That's my best understanding of what a Burning Man ranger does. I think they're volunteers but ...
Q And they talked with you about known perpetrators. And when you say "known perpetrators," do you mean perpetrators of sexual assault or sexual violence?
A That's what they said, yes.
Q And that there were known perpetrators that would return to the Burning Man festival on a yearly basis or more than once, I guess?
A That's what they said, this particular ranger, yep.
Q And that would be -- that would be a

nursing associations. This is a festival, organized -- first of all, it's a world problem. It's as old as the human race.

But it's an organized community or festival problem. So some perpetrators will seek out isolated areas where there is at least a purported culture or atmosphere of community or, you know, shared fun and happiness and they will do that purposely to perpetrate.

And I know that not from going to Burning Man but from going to the federal prisons and sitting in rooms with those people that are serving life sentences or more and, you know, double-life sentences for those crimes. I've heard them say firsthand that they will seek out remote communities with little resources and perpetrate their crimes there.

Q And the Burning Man festival is something -- somewhat of a unique event and that it's out on what's called "The Playa" out in the Black Rock Desert, correct?

A I think a lot of -- again, I've not been to many festivals, if any others. But there -- I see some of them are remote. This one from my limited knowledge of festivals seems pretty remote, just the

up in their golf cart and you go to that location and you wait. You wait a lot and you wait to see where -- where the need is, who the -- you know, you wait to identify the person that made the call and then where the person that's asking for help is, if they want a CIT member to come in and talk to them, perhaps they've changed their mind.

And if they do want to talk to CIT, we go and talk to them. Sometimes they don't want to talk to anybody by the time we get there. And we will just leave our information and a way to get ahold of the Crisis Intervention Team with the person that made the call for them, you know, or their proxy, for lack of a better word.

And we -- we go talk to them and we ask them to tell us what their needs are. And my understanding is everybody on my team is a mandated reporter. And we're there to meet that person's need and also, as we're mandated to, report a crime if we ascertain or determine that a crime has occurred or even a possibility of a crime has occurred.

And then we call our -- if we determine there's a possibility of a crime or somebody wants to report a crime, we will use our radios to contact

our supervisors and they will dispatch -- or somehow they communicate with law enforcement.

And countless times that's happened, unfortunately, and law enforcement will come. All the times that I've ever done this law enforcement came. I would speak to them. We worked collaboratively. They would ask for my suggestions or, you know, just I would introduce -- we do what's called a "warm handoff."

I would take them into the area of the participant and explain to the participant making the complaint that the law enforcement is here and, you know, I am a mandated reporter and what you've told me, you know, is a crime.

This is a typical training for when a crime occurs or when somebody discloses a crime has occurred and I will introduce the law enforcement officer to that person and they'll question them. At times the person -- the participant that's made the complaint will ask that I stay.

I only will stay if that's okay with law enforcement per Nevada law, and I understand that. That's different than other states that I've participated in or worked as a forensic nurse in, but I understand that law in Nevada and I respect

it. I've never -- the police have usually wanted me in the room while they're interviewing a participant. I can't actually ever recall any time they didn't want me in the room, if that's what the participant wanted. So that is -- what I just described to you is what my training is and that's what's happened --

Q All right.

A -- the proverbial nine times out of ten.

Q Sure. And when you say "mandatory reporter," then that means it's mandatory that, if you receive information that there's been a crime or a possibility of a crime, that you're mandated to report that to law enforcement, correct?

A Or if someone's in danger, being a victim of a crime, yeah.

Q Okay. And you -- I think you also testified that -- and I think you prefaced it with, unfortunately, this has happened countless times.

Can you give me an idea, if you can give me an estimate, for example, in 2022 when this incident occurred, how many reports of a possible sexual assault or sexual-type crime did you learn of or was otherwise reported to you?

A In 2022 my team responded to zero sexual

assault calls. In years prior I'd responded to as many as six in one night with law enforcement involved.

Q And so in all of 2022 -- excuse me -- you're saying you responded to no such calls.

A Yeah, there weren't any that -- I mean, we go there not knowing if, you know -- if it's a sexual assault or of a sexual nature even or what, you know.

In all the calls we went to -- I don't recall them all individually but I do document them in a system, and it's somewhere on record somewhere. But that particular year there was -- I did not respond. Myself and my team did not respond to any sexual assault calls.

I'm aware that other team members -- I think there's six teams at any given time. I mean, there were definitely sexual assault calls during 2022 but I was not directly involved in them.

Q Have you reviewed any body-worn camera video in preparation for your deposition?

A I have.

Q And did you review more than one body camera video?

A I -- yes.

were handcuffed, were you inside a tent speaking with a young woman?

A Yes.

Q Did she relate to you anything having to do with her being the victim of a sexual assault?

A She did not.

Q What is it that she relayed to you, if anything?

A She relayed to me that she was upset and dehydrated. She had come to Burning Man, I think, within the last 24 to 48 hours. There was obstacles to her finding her friends there.

She had gone to spiritual-based events put on by the independent camps at Burning Man, met a young man there that she liked and was attracted to and they agreed to consensual cuddling in his tent.

And he had an air conditioner in his tent and that was her -- she wanted to enter the tent with him, agreed to. She wanted air conditioning and she wanted to cuddle. He touched the inside of her knee or thigh. We were very -- my partner and I asked her specifically, you know, to show us where, and it was not even upper inner thigh. I don't mean to use qualifiers like that.

She was tired, she was upset because she

had asked the man not to touch her thigh. And, apparently, they had had very specific talk about what cuddling would look like for each of them and touching her inner thigh was not part of that. She corrected him, he took her correction.

Some time passed and he touched the inside of her thigh again and she felt that he was not keeping his agreement. She gave him what she described as a lecture on male entitlement and she left the tent and came to Zendo for hydration.

They saw her upset, they asked how they could help her and she had stated to them, I had a consent thing go on and I'm upset. She would not volunteer -- what was reported to us from whoever called us was that she would not volunteer more but was offered Crisis Intervention Team support and she consented to that. And we arrived and entered the tent and spoke to her. I can't remember her name but --

Q And we've not used her name. We've not used her name in this case for confidentiality reasons.

A Okay.

Q So that's -- that's not important.

A Great. One less thing for me to recall.

Great, yeah.

Q Let me ask you this, then: So the information that you obtained from the young woman is not the type of information that you would -- that would trigger your mandatory reporting to law enforcement of any sort of a crime or potential crime?

A It is not. I did -- no. My answer is no. I did tell her that, if she felt unsafe or, you know, what happened to her was -- I consoled her and empathized with her that what happened to her was not right, somebody didn't keep their agreement and it made her uncomfortable. But if at any time if she wanted to speak to us again -- I mean, we were done. She said she felt better. She wanted just to go to sleep.

But we gave her information if she wanted to speak with us again or if she came into contact with this person and again at any point or at anytime at Burning Man felt unsafe for any reason, she could contact us or law enforcement and we told her how to contact any -- to meet her resources. She was a new and it was her first year and she seemed pretty overwhelmed so ...

Q So you did not believe that she had been

understanding, no.
Q All right.
A I'm not -- I -- my understanding is that, if a crime occurs or someone is reporting a crime occurred, that law enforcement needs to make contact with them and at the very minimum provide them a brochure of resources that are available to them.
I don't -- I don't under -- I don't recall that they have a right to have anybody in the room, you know.
Q Okay. But, regardless, this was not a circumstance where it's your testimony that there was any crime or potential crime reported to you in terms of sexual assault, correct?
A Correct.
Q Did you stay on The Playa when you worked in your capacity as a crisis intervention person --
A For --
Q -- about the -- about the sort of the logistics of how it worked out there?
A Yeah. I don't -- when I'm working I don't come and go or leave The Playa when I'm working during the event. When I'm working post-event I come and go every day.
Q Okay.

Q And that's a Burning Man creation or acronym. Is that correct?

A Yeah. It's a department they have. It's a formal department within their -- you know, Burning Man's a business so, yeah, that's a department within their business.

Q Sure. We talked about an individual named Rikk, R-i-k-k. He's listed here as Rikk Van Epps, E-p-p-s. Does that sound correct in terms of his last name?

A Yeah.

Q He's also -- he's listed as a Duty Chief ESD Crisis Intervention Team as well.

Are you familiar with him holding that position?

A I know him. I don't think that's his official title, if that's what I listed. I can give you his title here in a moment.

But he's like an assistant -- so the hierarchy is Kate Gonella. I understand she's, for lack of a better term, the head of the entire Emergency Department Services, and I believe that includes, like, the hospital and everything.

And then under her is Anna Duffy, who is the boss of the Crisis Intervention Team. And then

don't know what happened either.

Q When you refer to a "pamphlet," are you referring to a pamphlet that relays to a person their rights as a -- or resources as a sexual assault victim?

A I don't -- I don't know. He just said that Donna Robinson's role was to present a pamphlet to -- I mean, he said something to the effect, and that's it, that's all that should have needed to happen here. I said, I don't know.

Q You're not familiar with any sort of pamphlets that are handed out at Burning Man that relate to potential victims of a sexual assault?

A It was the first year I -- no. I'm aware there was pamphlets. It was my first year that I understood only in interaction with John that that was a mandatory thing that had to happen. That's my answer, yeah -- or needed to happen. I'd never heard of that before, no.

Q Were you ever contacted by anyone from the Pershing County District Attorney's Office about any criminal charges stemming from the incident?

A No.

Q You were never charged with any criminal offenses as a result of the incident of August 31,

they tried to open the car to put me into it.

Q Well, do you know whether or not Donna Robinson advised Boyer to let you go?

A I don't know. I wasn't -- I wasn't there. I was taken away and secluded from everyone.

Q How far from the tent where you first encountered Donna Robinson were you taken by Boyer and Zohovetz, the other -- the BLM individual there? How far of a distance were you walked?

A I can tell you, like, in the amount of steps I went. I don't know the like --

Q Sure.

A Yeah. If felt like 50 steps, maybe more, maybe less. I couldn't hear or see the person I was supporting moments earlier. I couldn't see or hear my supervisor.

I think my supervisor tried to come over and was told to go away. Someone that was a bypasser -- a passerby that was recording on his phone, which I asked to keep recording, was told to shut off his phone. I felt quite sequestered and isolated.

Q Do you remember ever speaking to that individual? His name reportedly is Jed. Did you speak with him at any point in time after you were

Office?

A No. I mean, I called John "John" when I saw him because I was just relieved to see a familiar face but I wouldn't say ...

Q Do you remember --

A No.

Q Do you remember the names of any of the district -- deputy district attorneys or district attorney with whom you worked on those occasions when you indicated you had been asked to be an expert witness by Pershing County?

A Yeah. I was subpoenaed as an expert witness by Pershing County. I went there twice. I drove myself there. It was an assistant district attorney, and I don't recall his name. I can see his face and I could get you his name. This was a while ago. I would be surprised if he's still interest. Who knows.

Q You were subpoenaed to be an expert witness in what capacity?

A As a forensic -- I took forensic -- I was asked by police in 2016 to take forensic photos of a woman who was strangled by her assailant, a person that assaulted her. And my understanding is in the state of Nevada strangulation is -- can be and often

is considered assault with a deadly weapon, and so that was an attempted murder case.

Q At Burning Man?

A Yeah.

Q But following the incident of August 31st, 2022, though, you did not contact anyone from the Pershing County D.A.'s office to ask them, Am I going to be charged with a crime?

A I don't recall. I don't -- I don't -- I don't think so.

Q The medical treatment that you received at Rampart immediately after the incident, what did that consist of?

A They gave me a medication for pain. They medically assessed me. I received a medical assessment. They touched my wrists and my shoulder, my right shoulder. They gave me an ice pack and/or a heat pack. That's the -- that was my assessment. I didn't get an X-ray. They asked me to demonstrate range of motion and things like that.

Q Did they have the capacity out there to do diagnostic studies like X-rays?

A They do have X-rays out there, from what I understand, yeah.

Q What medication did they give to you?

different --

Q Did -- oh, I'm sorry.

A -- color.

Q Did you see any sort of logo or patch on any of the articles of clothing that Donna Robinson was wearing --

A I didn't.

Q -- that identified her as a police officer?

A I didn't. I -- my recollection is she was dressed in, you know, what I considered street clothing.

I mean, she came into the tent and said, "My name is Donna, can I come in?" And then I said, "Can you identify yourself," because, I mean, it is a private domicile and the person I was supporting was, like, startled like that. And she verbally identified herself as Pershing County Sheriff.

Q When you say that the tent that you were in was a private domicile, describe for me what the Zendo area of -- and, I guess, it would be called Black Rock City, or Burning Man, whatever they call it.

What was the -- those tents in the Zendo area, were they used by anyone who needed to come into that particular area seeking services or

Robinson opened the door to our surprise and said, "My name is Donna, can I come in?"

Q What was Deputy Boyer wearing?

A I mean, like, some -- I think it was brown or beige. I mean, he looked like a police officer, looked -- he looked like a law enforcement officer, rather than police, yeah.

I mean, he also had a gun and he also let me know that he had a TASER that he would TASE me with. So it was very clear to me that he was a law enforcement.

Q At no point in time during the events of August 31st, 2022, did you see Deputy Boyer remove his TASER from its holster. Is that correct?

A I saw him place his hand on his TASER. I did not see him remove it.

Q I'm sorry. Can you repeat that? You froze up just a little.

A I saw him place his hand on his TASER. I did not see him remove it, although, I'm not familiar with the TASER and how it functions, so I wouldn't know at that point if it was removed or not. But I saw a law enforcement officer with a hand on a weapon verbalizing, "If you resist, I will TASE you."

Q He -- did he TASE you at any point during the incident?
A He did not.
Q Were you ever contacted by anyone who indicated or stated that they were from the media asking you questions concerning the incident of August 31st, 2022?
A I was.
Q And describe that interaction or contact for me, if you would.
A I can't remember who it was from. It was a local news source. I contacted my attorney and deferred to him.
Q Oh, okay. It was after --
A I ultimately decided not to speak to news.
Q It was after your lawsuit was filed?
A I'm not sure if it was before or after. Yeah. I guess -- I mean, I had an attorney, so I guess so, yes. I guess I'm not sure of the filing date so ...
Q I'd like to talk about the mental health treatment that you have received since August 31st of 2022.
A Okay.
Q Can you tell me the names of your

A Thank you. Just to know. Thank you.
Q Okay. Let me just ask you just some general questions here because you -- we've talked a little bit about -- already about your volunteer position that you were involved with on the date of this incident, August 31, 2022.
And in that volunteer position, just to be -- to be certain, were you granted any sort of authority by other law enforcement agencies present there at Burning Man to act in any capacity as a law enforcement agent or anything of that sort?
A No.
Q You're not a sworn law enforcement officer, right?
A No, sir.
Q And you had no authority to conduct criminal investigations on that day. Is that correct?
A Correct.
Q You had no authority to determine whether a reported crime would be investigated by law enforcement on that day. Is that correct?
A Correct.
Q You understand that law enforcement officers were responsible for investigating reports

discuss sort of the sequence of events a bit that occurred.

First, you were physically placed in handcuffs. Is that correct?

A Yes, sir.

Q And who did that?

A Officer Boyer did.

Q Okay. And when he did that, were there any other officers involved in the incident in the area.

A There was officers all over. I even remember hearing many officers and seeing many officers. I don't know their names.

Q Who were the officers involved in the -- in actually placing handcuffs on you?

A Oh. No one else placed handcuffs on me but Officer Boyer.

Q And so at that particular time it was Officer Boyer that basically took custody of you. Is that right?

A Well, this was all new to me. But if that's how taking custody is defined, yes. I was handcuffed by him. I was told I would be TASED if I resisted, and he raised his voice at me and he pulled me.

And shortly after I started walking,

MR. SWEETIN: Let's go ahead and continue watching the video.

A Okay.

(Video played.)

BY MS. PARKS:

Q I think we left off at 5:19, so I'm going to start it from there. All right? Can you see it on your screen now?

A Yes, sir.

Q Okay.

(Video played.)

BY MR. SWEETIN:

Q As you indicated, I think we discussed earlier that your belt was removed. Is that correct?

A Yes.

Q Okay. And that was with your permission. Is that right?

A I was asked if it was okay and I consented. Yeah.

Q Okay. And then subsequently your handcuffs were removed from the back to the front. Is that right?

A Yes, sir.

Q Do you know why that was done?

A I asked to because the handcuffs were hurting me and my arm was -- my right arm, as I was being pulled to the truck, was hurt.

Q Okay. And Ranger Zohovetz assisted you in that. Is that correct?

A He -- I see him here in the video and instructing me. He checked my handcuffs. He said they were too loose, that they should be tightened.

And then I -- what I saw is that the two officers came up with an idea that I would -- I was still under arrest. My hands had to be in plain view but they would switch them from back to front. The.

(Video played.)

BY MR. SWEETIN:

Q So at that point Ranger Zohovetz had a conversation with you in regards to providing your name related to your detention. Is that correct?

A Uh-huh, yes, sir.

(Video played.)

BY MR. SWEETIN:

Q And just to be clear, we were just a minute or so previous to 10:15 on the video. We're continuing.

(Video played.)

Are you obligated or mandated to report any simple battery, to your knowledge?

A Can you just repeat the definition? I'm sorry. It's also later in the day. What is the definition of "battery"?

Q Okay. Don't worry. Battery is a willful and unlawful use of force or violence upon the person of another. Just in general.

I'll give you by way of example it could be punching somebody. Are you obligated or mandated to report such things as a nurse?

A My understanding of mandated reporting is -- I mean, if there's a crime and I'm privy to that and somebody's at risk, I'm mandated to report it, especially when it comes to children and the elderly and people that are compromised in their capacity.

Q Are you mandated to report sexual assaults?

A Yes.

Q All right. Are you familiar with the Nevada Revised Statute definition of a sexual assault?

A Not offhand. If you could review it for me I would -- I mean, I've -- every state has a different definition. Some talk about penile penetration, some don't. So if you could review it,

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, TINA M. DALPINO, a duly commissioned and licensed court reporter, Washoe County, State of Nevada, do hereby certify:

That I reported the taking of the deposition of HANNAH HOEKSTRA commencing on 6/1/2026.

That prior to being examined, the witness was duly sworn to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action.

DATED: At Reno, Nevada, this 6/8/2026.

Christina M. DalPino

Tina M. DalPino, CCR #641