TODD BLANCHE
Attorney General of the United States
SIGAL CHATTAH
First Assistant United States Attorney
District of Nevada
Nevada Bar Number 8264
JAMES R. SWEETIN
Assistant United States Attorney
Nevada Bar No. 5144
501 S. Las Vegas Blvd., Ste. 1100
Las Vegas, Nevada 89101
(702) 388-6336
James. Sweetin@usdoj.gov
*Attorneys for the Federal Defendant*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| HANNAH HALE HOEKSTRA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PERSHING COUNTY; DONNA ROBINSON, an individual; DANIEL E. BOYER, an individual; and PAUL ZOHOVETZ, an individual; collectively,<br><br>Defendants. | Case No. 3:24-cv-00392-MMD-CSD<br><br>**FEDERAL DEFENDANT PAUL ZOHOVETZ'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Fed. R. Civ. P. 56; LR 56-1)** |

Defendant Paul Zohovetz ("Ranger Zohovetz"), a law enforcement ranger employed by the United States Bureau of Land Management ("BLM"), moves under Federal Rule of Civil Procedure 56 for summary judgment on every claim remaining against him in Plaintiff Hannah Hale Hoekstra's Second Amended Complaint (ECF No. 47): the Second Claim (Nevada Constitution, Article 1, Section 18), the Third Claim (false imprisonment), and the Fourth Claim (intentional infliction of emotional distress). The motion is supported by the following memorandum of points and authorities, the exhibits identified in the accompanying index, the papers on file, and any argument the Court permits.

/ / /

/ / /

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case is about a detention that Ranger Zohovetz did not initiate, did not direct, did not prolong, and did not end. Discovery has now closed the gap that the Court identified at the pleading stage. Every witness with personal knowledge, Plaintiff included, agrees that Pershing County Sheriff's Office ("PCSO") Investigator Donna Robinson decided to detain Plaintiff, that PCSO Deputy Daniel Boyer handcuffed her and walked her out of the Zendo enclosure, and that Investigator Robinson alone decided to release her. Ranger Zohovetz, who was outside the enclosure the entire time, first touched Plaintiff roughly twenty-five paces after she was already in handcuffs, and his involvement thereafter consisted of walking beside Deputy Boyer, checking the handcuffs, helping move the handcuffs from behind Plaintiff's back to the front at her request, removing her utility belt with her consent so the cuffs could be moved, and telling her that Nevada law required her to identify herself. Plaintiff herself testified that she cannot identify any period in which Ranger Zohovetz controlled her detention, that he never questioned her, and that she has no knowledge of his having any role in the decisions to detain or release her.

Those undisputed facts dispose of the three claims that remain against Ranger Zohovetz. The Court previously held that Plaintiff's tort claims survive against Ranger Zohovetz only to the extent they rest on conduct "outside the scope of his federal employment," and that the Nevada constitutional claim survives only on the theory that he acted under color of state law as a "de facto" county agent. (ECF No. 45 at 12, 15–16.) The record forecloses both theories. Ranger Zohovetz was on duty as a BLM ranger, in BLM uniform, assigned by BLM to an integrated patrol unit under the 2022 Burning Man Operation Plan, performing the back-up and cover function that federal law (43 U.S.C. § 1733(d)), the Plan, and his federal position description assign to him. No one from Pershing County supervised him; he was never deputized; and nothing he did was a "truly independent venture." Nev. Rev. Stat. ("NRS") 41.745(1). Because his conduct was within the scope of his federal employment, the Federal Tort Claims Act ("FTCA"), as amended

by the Westfall Act, is Plaintiff's exclusive remedy for the tort claims, 28 U.S.C. § 2679(b)(1), and the state constitutional claim fails because he was not a state actor. And even if the Court reached the merits, no reasonable jury could find that Ranger Zohovetz confined Plaintiff without legal justification, seized or searched her unreasonably, or engaged in conduct "outside all possible bounds of decency." Summary judgment should be entered in his favor.

## II. PROCEDURAL HISTORY

Plaintiff sued in September 2024. Her First Amended Complaint (ECF No. 6) asserted four claims against all defendants: (1) unreasonable search and seizure under the Fourth Amendment; (2) unreasonable search and seizure under Article 1, Section 18 of the Nevada Constitution; (3) false imprisonment; and (4) intentional infliction of emotional distress ("IIED"). Ranger Zohovetz moved to dismiss. (ECF Nos. 23, 24.) On September 3, 2025, the Court dismissed the Fourth Amendment claim against Ranger Zohovetz with prejudice because no *Bivens* remedy extends to this context. (ECF No. 45 at 8–11, 15.) The Court denied dismissal of the Nevada constitutional claim, reasoning that the pleading could be read to allege that Ranger Zohovetz acted "under the color of state law by substantially cooperating with the State Defendants," a question the Court could not resolve on the pleadings. (*Id.* at 11–12.) The Court dismissed the false imprisonment and IIED claims, holding that to the extent they rest on Ranger Zohovetz's conduct "as a federal employee, the FTCA's requirement for administrative exhaustion applies, and she is precluded from pursuing these claims because they have not been exhausted," and granting leave to amend only "to the extent Plaintiff can allege facts to state a plausible claim for relief based on Zohovetz's conduct outside the scope of his federal employment." (*Id.* at 15–16.)

Plaintiff filed the operative Second Amended Complaint ("SAC") on September 19, 2025. (ECF No. 47.) The SAC re-pleads all four claims against all defendants. It retains the Fourth Amendment claim against Ranger Zohovetz "solely to retain the claim for appeal," (*id.* at 9 n.8), and alleges that Ranger Zohovetz "additionally engaged in actions outside the

course and scope of his federal employment, acting in concert with and as a de facto deputy or agent for the Pershing County Sheriff." (*Id.* ¶ 5; *see also id.* ¶¶ 65–66, 74–75, 81.) Ranger Zohovetz answered on February 13, 2026. (ECF No. 59.) Fact discovery, including the depositions of Plaintiff, Deputy Boyer, and Investigator Robinson, is complete.

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS ("SUF")

Pursuant to LR 56-1, Ranger Zohovetz sets forth the following material facts as to which there is no genuine dispute, each supported by citation to the record. (Deposition excerpts are attached as Exhibits A (Hoekstra), B (Boyer), and C (Robinson). Ranger Zohovetz's body-worn camera video is Exhibit D; Deputy Boyer's body-worn camera video is Exhibit E.; the Declaration of Blain Parnell, authenticating the 2022 Burning Man Operational Plan ("Plan") and Plan is Exhibit F; the Declaration of Ranger Zohovetz is Exhibit G; the Declaration of  Lynea J. Garcia, authenticating Ranger Zohovetz's employment status and position description ("PD"), and PD in 2022, is Exhibit H; the declaration of Rebecca Pock verifying Plaintiff has not made a FTCA claim related to the subject in the current case is Exhibit I.). )

### A. The Parties and the Federal–State Framework at the 2022 Event

1. Burning Man 2022 was held August 28 through September 5, 2022, in Black Rock City, on BLM-administered public land in Pershing County, Nevada. (ECF No. 47 ¶ 12; ECF No. 59 ¶ 12; Boyer Dep. 24:14–18).

2. At all relevant times Ranger Zohovetz was employed by the United States Department of the Interior, BLM, as a law enforcement ranger responsible for enforcing federal law on federal land. (ECF No. 59 ¶ 5; Robinson Dep. 184:7–17; Zohovetz Decl. ¶3 (Ex. G). He was on duty, in BLM uniform, on August 31, 2022. (Robinson Dep. 184:14–17; Boyer Dep. 43:18–44:11; Zohovetz Decl. ¶ 10 (Ex. G)).

3. BLM and PCSO conducted law enforcement at the 2022 event under the 2022 Burning Man Operation Plan (the "Plan"), which "details roles for various agencies participating in such event." (ECF No. 47 ¶ 17; ECF No. 59 ¶ 17; Boyer Dep. 27:11–23 (identifying the Plan, Boyer Depo. Ex. 1); Robinson Dep. 29:11–30:24; Blaine Parnell,

BLM Nevada State Chief Ranger, Parnell Decl. ¶¶ 5-6 (Ex. F) (identifying the Plan and verifying it was in effect during the Burning man Event on August 31, 2022); 2022 Burning Man Operation Plan ("Burning Man Plan") at 5 (Ex. F, Sub. Ex. 1)).

4. The Plan provides that "[t]he Pershing County Sheriff's Office will enforce Nevada State laws, statutes, and county ordinances on BLM administered lands and private lands surrounding the event," that "BLM law enforcement's role is to ensure public safety and resource protection through the enforcement of federal laws, regulations, event closure orders, and permit stipulations," and that "BLM's law enforcement authority to enforce federal laws on public lands is derived from 43 USC § 1733, Federal Land Policy Management Act (FLPMA)." (ECF No. 47 ¶ 18; ECF No. 59 ¶ 18; Ex. G at ¶¶ 3, 5; Burning Man Plan at 5, (Ex. F, Sub. Ex. 1)).

5. The Plan provides for Integrated Patrol Units "staffed by one BLM ranger and one Pershing County deputy," and states: "In the event a contact results in a federal citation, or a potential federal case, the BLM Ranger will be designated as the primary case officer and the Pershing County deputy will be designated as the assisting officer. In the event of a state citation, or state arrest, roles will reverse." (ECF No. 47 ¶ 19; ECF No. 59 ¶ 19; Robinson Dep. 36:12–37:1; Ex. G at ¶¶ 6-7; Ex. G ¶ 7; Burning Man Plan at Section 2, Integrated Patrol Units, (Ex. F, Sub. Ex. 1)).

6. The Plan provides that "[a]ny state arrest will be conducted by the Pershing County Sheriff's Office" and that "BLM may be requested to assist with transport to the JOC jail or Pershing County Jail." (ECF No. 47 ¶ 20; ECF No. 59 ¶ 20; Robinson Dep. 61:1–12, 187:3–190:1; Ex. G ¶¶ 8-9; Burning Man Plan at Section 2, Arrests, (Ex. F, Sub. Ex. 1)). Investigator Robinson testified that, in a state arrest, BLM's role also includes serving "as a cover position if there's not another deputy available", a "second law enforcement personnel [who] is there to ensure the safety of the first one." (Robinson Dep. 61:13–24; *See* Ex. G ¶¶ 8-9).

7. Deputy Boyer and Ranger Zohovetz were partnered in an integrated unit and assigned to the same vehicle on August 31, 2022. (Boyer Dep. 43:18–44:11, 45:10–13,

105:5–8; Robinson Dep. 36:25–37:1; Ex. G at ¶ 8) Deputy Boyer was a Lyon County reserve deputy working under contract for Pershing County, "strictly employed by the Sheriff's Office" for the event. (Boyer Dep. 9:25–10:7, 12:23–13:11, 22:18–21). Ranger Zohovetz was a BLM Law Enforcement Ranger delegated and authorized by the Secretary of the Interior under 43 U.S.C. § 1733(c)(2) to carry out law enforcement responsibilities on the public lands, including authority to carry a firearm, execute warrants, make arrests, and conduct searches and seizures according to federal law (Ex. G at ¶ 3).

8. Ranger Zohovetz's federal position description for a Law Enforcement Ranger (GS-1801) includes: "Develops and maintains liaison with other Federal, State, and local law enforcement agencies to share in the resources in order to provide additional protection of people and property on public lands. Cooperates in the investigation and disposition of cases. Provides assistance, e.g., back-up, to other law enforcement officers, exchanges case information, and coordinates other law enforcement activities of mutual interest." Ex. H, Decl. of Lynea Garcia, ¶ 11, Position Description Law Enforcement Ranger, GS-1801-09.

9. PCSO deputies did not report to BLM supervisors, and PCSO had no supervisory authority over BLM rangers. (Robinson Dep. 34:11–12, 190:24–191:3, 191:16–19; Ex. G at ¶ 5; Ex. H, ¶ 10-11). There was no chain of command between Deputy Boyer and Ranger Zohovetz; neither was "in charge of one another." (Boyer Dep. 138:1–8; Ex. G at ¶ 8). Ranger Zohovetz was never employed by, sworn by, or deputized by Pershing County. (Ex. G at ¶ 4; *see* ECF No. 41 at 10; Ex. H, ¶ 10-11).

**B. The Investigation and the Decision to Detain Plaintiff**

10. On the evening of August 31, 2022, Deputy Boyer and Ranger Zohovetz responded to a dispatch that Burning Man personnel were requesting law enforcement assistance at a Zendo location; Deputy Boyer handled the contact with Zendo staff, cleared the call, and then heard dispatch advise Investigator Robinson that Zendo and ESD personnel would be handling possible sexual assaults at that location. (Boyer Dep. 40:11–42:8, 45:6–48:19 (reading Boyer narrative, Boyer Dep. Ex. 3); Ex. G at ¶¶ 10-11).

11. Investigator Robinson, PCSO's sexual assault investigator, was dispatched to the location to investigate two reported sexual assaults. (Robinson Dep. 20:21–21:13, 73:10–23, 110:2–3, 162:11–13.) Upon arrival she "took over the primary role" and ran the investigation; Deputy Boyer served as her "cover officer" outside the Zendo fence. (Robinson Dep. 99:24–100:7, 185:4–6; Boyer Dep. 113:11–114:1, 116:15–117:3.) The investigation was a state-law investigation conducted under PCSO's authority. (Robinson Dep. 191:4–15; Ex. G at ¶ 12).

12. Ranger Zohovetz did not enter the Zendo enclosure at any time; he remained outside on the street with a group of people near the vehicles. (Boyer Dep. 122:9–17; Robinson Dep. 184:18–185:3, 186:8–10; Ex. G at ¶ 12). He had no contact with Investigator Robinson in the course of her investigation, and Investigator Robinson gave him no direction. (Robinson Dep. 185:7–14, 190:24–191:3; Ex. G at ¶ 12).

13. Investigator Robinson looked into the tent where Plaintiff was speaking with the reported victim and asked to speak with her; Plaintiff told her they were "going to pass on that." Investigator Robinson asked Plaintiff to step out of the tent; Plaintiff did so and the two argued outside the tent about whether Investigator Robinson would move away from the tent. (Robinson Dep. 75:14–23, 139:3–23, 141:2–14, 150:12–19; Hoekstra Dep. 60:6–16, 94:12–17.)

14. Investigator Robinson decided that Plaintiff would be detained for hindering and delaying her investigation: "At that point, it was like, okay, you're going to be detained. I called Deputy Boyer over." (Robinson Dep. 96:2–11.) She waved Deputy Boyer in and signaled, with one hand over each wrist, for him to detain Plaintiff. (Robinson Dep. 101:18–102:2, 170:13–19; Boyer Dep. 59:10–21, 111:12–21.)

15. Deputy Boyer handcuffed Plaintiff behind her back. Plaintiff testified that "[n]o one else placed handcuffs on me but officer Boyer," and that it was Deputy Boyer who told her she was under arrest and would be tased if she resisted. (Hoekstra Dep. 131:3–24, 133:15–16, 176:8–10; Boyer Dep. 112:1–8, 120:10–19; Robinson Dep. 65:7–11.) Deputy Boyer's body-worn camera shows Plaintiff exiting the tent at approximately 18:20

and Investigator Robinson waving Deputy Boyer in at approximately 19:00 on that recording. (Boyer Dep. 114:18–115:11; Ex. E at [18:20–19:30].

16. Ranger Zohovetz was not consulted about, and had no role in, the decision to detain Plaintiff. Deputy Boyer did not request his assistance; "he saw me coming out with her and immediately jumped in to assist me." (Boyer Dep. 122:18–24, 138:11–19; Ex. G at ¶ 13). Investigator Robinson testified that Ranger Zohovetz was not involved in the initial detention. (Robinson Dep. 185:15–186:10.) Plaintiff has no personal knowledge of who decided to detain her and does not recall Ranger Zohovetz being near her, touching her, or speaking to her until she was roughly halfway, about twenty to twenty-five paces, from the tent to the vehicles. (Hoekstra Dep. 132:6–25, 133:21–22, 136:21–137:1, 140:1–14, 141:13–143:10, 175:13–176:7.)

**C. Ranger Zohovetz's Involvement After the Handcuffing**

17. Deputy Boyer moved Plaintiff approximately 25–30 feet from the tent to the agency vehicles parked outside the enclosure, where his partner and the vehicles were, to remove her from the area where Investigator Robinson was working. (Boyer Dep. 121:1–15; Hoekstra Dep. 87:6–16.) As Deputy Boyer walked Plaintiff out, Ranger Zohovetz walked alongside and placed a hand on Plaintiff's left arm. (Boyer Dep. 122:5–8; Hoekstra Dep. 146:12–18, 154:6–11; Ex. D at [0:55–1:40]; Ex. G at ¶ 13).

18. At the vehicles, Deputy Boyer stood with Plaintiff the entire time; Ranger Zohovetz was nearby but farther from Plaintiff than Deputy Boyer, and at times stepped away. (Hoekstra Dep. 134:3–4, 145:2–5, 146:19–147:1, 150:2–20, 158:9–23; Ex. G at ¶ 15). Deputy Boyer testified that "Ms. Hoekstra's care was my responsibility and Ranger Zohovetz would be assisting." (Boyer Dep. 138:5–8; Ex. G. at ¶ 15).

19. Plaintiff complained that the handcuffs hurt. Deputy Boyer agreed to loosen them "to de-escalate." (Boyer Dep. 127:24–128:7.) Ranger Zohovetz checked the handcuffs for tightness. (ECF No. 59 ¶ 39; Hoekstra Dep. 149:6–13, 154:15–17; Ex. G at ¶ 16).

20. Ranger Zohovetz suggested, and Plaintiff agreed, that the handcuffs be moved from behind her back to the front. (Boyer Dep. 128:10–20; Hoekstra Dep. 148:21–

149:3 ("I asked to because the handcuffs were hurting me"); Ex. G at ¶ 17). Because Plaintiff wore a utility belt with pockets that would be accessible with her hands in front, Ranger Zohovetz asked Plaintiff whether he could remove the belt; Plaintiff consented; he removed it and gave it to Deputy Boyer; and Deputy Boyer then re-cuffed Plaintiff in front. (ECF No. 59 ¶ 40; Hoekstra Dep. 148:13–20 ("I was asked if it was okay and I consented"), 155:5–8, 157:10–11; Boyer Dep. 128:16–20; Ex. D at [approx. 5:19–6:30]; Ex. G at ¶ 17).

21. Deputy Boyer was instructed, through Burning Man Ranger "Reno," to obtain a field interview (name, date of birth, contact information) from Plaintiff for the report. (Boyer Dep. 130:5–21.) Ranger Zohovetz told Plaintiff that she was legally required to provide her name. (Hoekstra Dep. 149:16–19, 154:18–20, 177:24–178:2; Ex. D at [approx. 9:00–10:30]; Ex. G at ¶ 18). He did not question Plaintiff about the reported sexual assault, about her contact with the reported victim, or about the reasons for her detention. (Hoekstra Dep. 156:20–157:6; Ex. G at ¶ 18).

22. Ranger Zohovetz asked a bystander who was filming Plaintiff to step back some distance while continuing to film, citing Plaintiff's privacy while she was being asked for identifying information. (ECF No. 59 ¶ 41; Hoekstra Dep. 158:19–23; Ex. G at ¶ 19).

23. Ranger Zohovetz never handcuffed, struck, pushed, or threatened to use force against Plaintiff. Plaintiff identifies his physical contact as a hand on her arm while walking, touching the handcuffs, and removing her belt after asking her permission. (Hoekstra Dep. 146:18, 154:6–23, 157:7–15, 177:13–23; Ex. G at ¶ 21). Plaintiff "can't really tell" when Ranger Zohovetz came into the picture and cannot identify any period during which he alone controlled her detention. (Hoekstra Dep. 133:21–22, 157:16–158:5.)

**D. Release**

24. After speaking with the reported victim, Investigator Robinson decided not to arrest Plaintiff and to release her after a field interview. (Robinson Dep. 38:6–12, 103:18–104:4; Boyer Dep. 130:11–14.) Deputy Boyer removed the handcuffs. (Hoekstra Dep. 150:13–16, 151:4–9.) Ranger Zohovetz had no involvement in the decision to release

Plaintiff and was some distance away speaking with others when she was released. (Hoekstra Dep. 150:2–20, 158:15–159:9; Boyer Dep. 135:22–24; Ex. G at ¶ 20). Plaintiff had no further contact with Ranger Zohovetz. (Hoekstra Dep. 153:20–22.)

25. Plaintiff was detained for approximately 40 minutes in total, from Deputy Boyer's handcuffing to her release, and was not cited or charged. (ECF No. 47 ¶ 47; Hoekstra Dep. 83:24–84:9; Robinson Dep. 60:23–25, 71:7–23.) Ranger Zohovetz's involvement spanned roughly thirteen minutes of that period. (Hoekstra Dep. 151:10–16, 154:21–23; Ex. D; Ex. E; Ex. G at ¶ 21).

**E. Injury**

26. Plaintiff's physical complaints, redness, swelling, and bruising at the wrists and soreness in the right shoulder, resolved within days (wrists) to two or three weeks (shoulder). (Hoekstra Dep. 14:16–15:5, 92:17–93:5, 179:7–16.) She attributes the shoulder complaint to Deputy Boyer moving her arm behind her back and pulling her. (Hoekstra Dep. 16:1–6, 149:1–3.)

27. Plaintiff had been diagnosed with post-traumatic stress disorder years before August 31, 2022, and was in treatment with her current counselor before the incident. (Hoekstra Dep. 102:21–103:15, 105:3–9.) No mental health provider has told her that she suffered a permanent psychological injury from the incident. (Hoekstra Dep. 172:7–173:4.)

28. Plaintiff never presented an administrative tort claim to the Department of the Interior or any federal agency. (ECF No. 37 at 2; ECF No. 45 at 13; Decl.of Rebecca Pock ¶¶ 6-8 (Ex. I)

## IV. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant identifies

the portions of the record showing the absence of a genuine dispute, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial," and may not rest on allegations or "metaphysical doubt." *Id.* at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). Where the events are captured on video, the Court views the facts "in the light depicted by the videotape" and need not credit a version of events that the recording "blatantly contradict[s]." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). At summary judgment the Court considers evidence whose contents could be presented in admissible form at trial. Fed. R. Civ. P. 56(c)(2); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

## V. ARGUMENT

### A. The Undisputed Record Establishes That Ranger Zohovetz Acted Within the Scope of His Federal Employment.

Whether a federal employee acted within the scope of employment is determined under the respondeat superior law of the state where the conduct occurred. *McLachlan v. Bell*, 261 F.3d 908, 911 (9th Cir. 2001); *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 876 (9th Cir. 1992); *see* ECF No. 45 at 14 (applying Nevada law). Under NRS 41.745(1), an employer is not liable for an employee's intentional conduct only if the conduct "(a) [w]as a truly independent venture of the employee; (b) [w]as not committed in the course of the very task assigned to the employee; and (c) [w]as not reasonably foreseeable under the facts and circumstances of the case considering the nature and scope of his or her employment." All three conditions must be met to take conduct outside the scope; the statute is conjunctive. *See* ECF No. 45 at 14. Although scope is often a fact question under Nevada law, it may be decided as a matter of law where, as here, the material facts are undisputed. *See Wood v. Safeway, Inc.*, 121 Nev. 724, 729–32 (2005) (summary judgment appropriate where no rational trier of fact could find for nonmovant); *Prell Hotel Corp. v. Antonacci*, 86 Nev. 390, 391–92, 469 P.2d 399, 400–01 (1970).

None of the NRS 41.745(1) conditions can be met on this record. *First*, Ranger Zohovetz's conduct was the opposite of an independent venture. He was on duty, in uniform, assigned by BLM to an integrated patrol unit with Deputy Boyer, and responded to a dispatched call with his assigned partner in their assigned vehicle. (SUF ¶¶ 2, 7, 10.) *Second*, providing back-up to a partner officer who is detaining a person is the very task assigned to him: his federal position description expressly directs him to "[p]rovide[] assistance, e.g., back-up, to other law enforcement officers" and to "[d]evelop[] and maintain[] liaison with other Federal, State, and local law enforcement agencies," (SUF ¶ 8); the Plan assigns BLM rangers an "assisting officer" role in state arrests and contemplates BLM assistance with transport, (SUF ¶¶ 5–6); and Investigator Robinson confirmed that a BLM ranger's role in a state arrest includes "cover" to "ensure the safety of the first" officer, (SUF ¶ 6). Congress itself authorizes exactly this cooperation: FLPMA provides that the Secretary of the Interior "is authorized to cooperate with the regulatory and law enforcement officials of any State or political subdivision thereof in the enforcement of the laws or ordinances of such State or subdivision." 43 U.S.C. § 1733(d). *Third*, it was plainly foreseeable that a BLM ranger paired with a county deputy at an event policed under an "integrated command structure" would assist his partner with a detention. (SUF ¶¶ 3–7.)

Plaintiff's contrary theory, that Ranger Zohovetz "exceeded his legal and jurisdictional authority" because the detention was for a state offense, (ECF No. 47 ¶¶ 66, 75), confuses the subject matter of the underlying investigation with the scope of Ranger Zohovetz's federal duties. Federal law affirmatively authorizes BLM to cooperate with local officers "in the enforcement of the laws . . . of such State." 43 U.S.C. § 1733(d). A BLM ranger who provides cover and assistance to a county deputy pursuant to a written federal–state operations plan is performing a federal function, not abandoning one. Nor is there any evidence that Ranger Zohovetz was deputized, sworn, paid, or supervised by Pershing County; the only evidence is to the contrary. (SUF ¶ 9.) The Court should

therefore hold, as a matter of law, that Ranger Zohovetz acted within the scope of his federal employment throughout his involvement with Plaintiff.

**B. The Third and Fourth Claims Are Barred Because the FTCA Is Plaintiff's Exclusive Remedy and She Did Not Exhaust It.**

The Westfall Act makes the FTCA remedy against the United States "exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim," and provides that "[a]ny other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee . . . is precluded." 28 U.S.C. § 2679(b)(1). The statute "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). The only exceptions are actions "brought for a violation of the Constitution of the United States" or of a federal statute that authorizes suit against an individual. 28 U.S.C. § 2679(b)(2). The immunity applies even where an FTCA exception leaves the plaintiff without a remedy against the United States. *United States v. Smith*, 499 U.S. 160, 165–67 (1991).

Plaintiff's false imprisonment and IIED claims are common-law tort claims for money damages arising out of acts Ranger Zohovetz undertook in the course of his federal duties. (Part V.A, *supra*.) They may proceed, if at all, only against the United States under the FTCA, and only after the claimant "shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied." 28 U.S.C. § 2675(a). Exhaustion is a jurisdictional prerequisite that cannot be waived or cured by amendment. *McNeil v. United States*, 508 U.S. 106, 111–13 (1993); *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006). Plaintiff concedes she never presented an administrative claim. (SUF ¶ 28).

This Court has already held as much. It ruled that "to the extent Plaintiff's false imprisonment and intentional infliction of emotional distress claims are based on Zohovetz's actions as a federal employee, the FTCA's requirement for administrative

exhaustion applies, and she is precluded from pursuing these claims," and permitted re-pleading only as to conduct "outside the scope of his federal employment." (ECF No. 45 at 15–16.) The SAC's new allegations that Ranger Zohovetz acted "as a de facto deputy" (ECF No. 47 ¶¶ 5, 74, 81) were sufficient to re-plead; they are not sufficient to survive summary judgment. Plaintiff must now come forward with evidence that some act of Ranger Zohovetz fell outside his federal employment. She has none. The record shows a uniformed federal ranger, under federal supervision, performing the back-up function assigned by his federal employer and authorized by federal statute. Because every act Plaintiff attributes to Ranger Zohovetz was within the scope of his federal employment, the Third and Fourth Claims against him are barred by 28 U.S.C. § 2679(b)(1) and by the law of the case.

**C. The Second Claim Fails Because Ranger Zohovetz Acted Under Color of Federal, Not State, Law.**

The Court allowed the Nevada constitutional claim to proceed past the pleadings only because the FAC could be read to allege that Ranger Zohovetz acted "under the color of state law by substantially cooperating with the State Defendants." (ECF No. 45 at 12.) The Court was explicit that "[t]he fact that a BLM officer is responsible for enforcing federal laws is not illuminating as to whether they were in fact doing so," (*id.*), and that the question turns on "the actual nature and character of th[e] action," (*id.* at 12 n.10 (quoting *Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997))). The record now answers that question.

Federal officers "acting under federal authority are generally not considered to be state actors"; they may be treated as acting under color of state law only where they "conspired with or acted in concert with state officials to some substantial degree." *Cabrera v. Martin*, 973 F.2d 735, 742 (9th Cir. 1992). In *Thai v. Cnty. of Los Angeles*, 127 F.4th 1254, 1261 (9th Cir. 2025), the Ninth Circuit held that whether officers on a joint federal–state law enforcement operation act under color of state or federal law is determined under "the totality of the circumstances," with particular weight on the *source of the authority* under

which the operation was conducted and whether the challenged conduct was *subject to the immediate control* of federal or state supervisors. Applying that test, *Thai* held that county investigators assigned to a federal task force acted under color of *federal* law notwithstanding that they carried state credentials and were paid by the county, because the source of the program's authority was federal and a federal agent controlled day-to-day operations. *Id.* at 1261–64.

Every *Thai* factor points the same direction here, and more strongly. Ranger Zohovetz was not a county employee on a federal task force; he was a federal officer, in federal uniform, paid and supervised by the federal government. (SUF ¶¶ 2, 9.) The source of his authority to be present and to assist was federal: FLPMA, 43 U.S.C. § 1733(c)–(d), and the BLM–PCSO Plan that implements it. (SUF ¶¶ 3–8.) No PCSO official supervised or directed him; Investigator Robinson, who ran the investigation, testified she gave him no direction and had no supervisory authority over BLM, and Deputy Boyer testified that neither he nor Ranger Zohovetz was in charge of the other. (SUF ¶¶ 9, 12.) Ranger Zohovetz never entered the enclosure, took no part in the investigation, and played no role in the decision to detain or to release. (SUF ¶¶ 12–16, 24.) The only "cooperation" in the record is a federal ranger standing by his assigned partner after a detention had already been effected, precisely the back-up function his federal employer assigned him. That is not the "significant and substantial cooperation" in the *challenged* conduct that *Cabrera* requires, 973 F.2d at 742–44, and it does not convert a federal officer into a state actor. Plaintiff's own characterization of Ranger Zohovetz as "a de facto deputy" is a legal conclusion unsupported by any evidence that Pershing County ever conferred authority on him or exercised control over him.

Because Ranger Zohovetz acted under color of federal law, the Second Claim fails for three independent reasons. *First*, the implied damages remedy recognized in *Mack v. Williams*, 138 Nev. 854, 522 P.3d 434 (2022), was grounded in the State's own waiver-of-immunity scheme and the need to vindicate rights against state actors; nothing in *Mack* suggests that Nevada courts would imply a state constitutional damages action against a

federal officer performing federal duties. *See* ECF No. 24 at 15 (collecting cases holding that state constitutional claims do not lie against federal employees acting under federal law). *Second*, the Westfall Act's exclusivity provision reaches "[a]ny other civil action or proceeding for money damages arising out of or relating to the same subject matter," 28 U.S.C. § 2679(b)(1), and excepts only claims under "the Constitution of the *United States*," *id.* § 2679(b)(2)(A) (emphasis added). A state-constitutional damages claim is not within the exception and is therefore precluded. *Third*, under the Supremacy Clause a federal officer is immune from state-law liability for acts that were necessary and proper to the performance of his federal duties and that he honestly and reasonably believed were necessary. *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890); *Clifton v. Cox*, 549 F.2d 722, 725–29 (9th Cir. 1977). Standing by an assigned partner, checking handcuffs, and helping to re-position them at the detainee's request fall comfortably within that protection.

**D. Alternatively, the Second Claim Fails on the Merits Because Ranger Zohovetz Did Not Unreasonably Seize or Search Plaintiff.**

Even if Nevada's Article 1, Section 18 remedy could reach Ranger Zohovetz, the claim fails on the undisputed facts. *Mack* left the substantive elements to "well-settled principles on seizure, reasonable suspicion, and consent," 138 Nev. at 857, 522 P.3d at 442, and the Nevada Supreme Court has aligned its reading of Article 1, Section 18 with federal Fourth Amendment doctrine. *See State v. Lloyd*, 129 Nev. 739, 749-752, 312 P.3d 467, 473-474 (2013). Under those principles, liability is personal: a defendant must have personally participated in the deprivation. *Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010). An officer who did not himself effect the challenged seizure may be liable as an "integral participant" only if he "knew about and acquiesced in the constitutionally defective conduct as part of a common plan," or "set in motion a series of acts by others" that he "knew or reasonably should have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 889–92 (9th Cir. 2022); *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941–42 (9th Cir. 2020); *Spencer v. Pew*, 117 F.4th 1130, 1144–45 (9th Cir. 2024).

Plaintiff was seized when Investigator Robinson ordered her detained and Deputy Boyer handcuffed her. (SUF ¶¶ 14–15.) Ranger Zohovetz was outside the enclosure, did not know what had been said between Plaintiff and Investigator Robinson, was not consulted, and did not set the detention in motion. (SUF ¶¶ 12, 16.) Plaintiff concedes she cannot say he was present before the handcuffing and cannot identify any period in which he controlled her detention. (SUF ¶¶ 16, 23.) There was no "common plan" to detain Plaintiff unlawfully; there was a PCSO investigator's on-the-spot decision, communicated by a hand signal to her cover officer. A later-arriving officer who assists a fellow officer with an already-effected detention is entitled to rely on that officer's determination; he is not required to re-investigate the basis for the stop before lending a hand. *See United States v. Hensley*, 469 U.S. 221, 231–33 (1985); *United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007). On this record no reasonable jury could find that Ranger Zohovetz knew of and acquiesced in an unlawful seizure as part of a common plan.

Nor did Ranger Zohovetz's own conduct amount to an unreasonable seizure or search. Checking the tightness of handcuffs applied by another officer, and then helping to move them from the back to the front *at the detainee's request*, is the antithesis of the conduct courts have found unreasonable. *Cf. LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (refusal to loosen painfully tight handcuffs); *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1109–12 (9th Cir. 2004) (same). Removing Plaintiff's utility belt was done with her express consent and for the purpose of accommodating her request to be cuffed in front, (SUF ¶ 20); a consensual removal of an item from the detainee's waist is not an unreasonable search. Telling a detainee that she is required to identify herself is an accurate statement of Nevada law: a person detained under NRS 171.123 "shall identify himself or herself, but may not be compelled to answer any other inquiry." NRS 171.123(3); *see Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 187–89 (2004) (upholding NRS 171.123(3)). And asking a bystander to step back while a detainee is asked for personal identifying information neither seized nor searched Plaintiff. None of this conduct caused Plaintiff's detention to begin, to continue, or to end. (SUF ¶¶ 14–16, 24.)

**E. Alternatively, the Third and Fourth Claims Fail on the Merits.**

*False imprisonment.* Under Nevada law, false imprisonment requires that the plaintiff "be restrained of [her] liberty under the probable imminence of force without any legal cause or justification." *Hernandez v. City of Reno*, 97 Nev. 429, 433, 634 P.2d 668, 671 (1981) (quoting *Marschall v. City of Carson*, 86 Nev. 107, 110, 464 P.2d 494, 497 (1970)). An actor is liable only if he "acts intending to confine the other . . . within boundaries fixed by the actor" and his act "directly or indirectly results in such a confinement." *Id.* (quoting Restatement (Second) of Torts § 35). Ranger Zohovetz fixed no boundaries and confined no one. The confinement was ordered by Investigator Robinson, effected by Deputy Boyer, maintained under Deputy Boyer's responsibility, and ended by Investigator Robinson. (SUF ¶¶ 14–18, 24.) Plaintiff's own account is that Ranger Zohovetz's contributions were a hand on her arm while walking, checking and helping to reposition the cuffs at her request, removing her belt with her consent, and telling her to give her name. (SUF ¶¶ 17–23.) Those acts did not cause her confinement, directly or indirectly; they made it more comfortable. Moreover, a peace officer's investigative detention of a person reasonably suspected of a crime committed in the officer's presence is authorized by statute, NRS 171.123(1), (4), and Investigator Robinson articulated her basis for believing Plaintiff was willfully hindering and delaying her investigation in violation of NRS 197.190. (Robinson Dep. 139:3–23, 144:5–25, 150:12–19.) Whether or not a jury ultimately agrees with Investigator Robinson, a back-up officer who assists after the fact with a detention that his fellow officers represented to be lawful cannot be said to have confined the plaintiff "without any legal cause or justification."

*IIED.* Plaintiff must prove "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Olivero v. Lowe*, 116 Nev. 395, 398, 995 P.2d 1023, 1025 (2000) (quoting *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 91–92 (1981)). "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a

civilized community." *Maduike v. Agency Rent-A-Car*, 114 Nev. 1, 4, 953 P.2d 24, 26 (1998). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992) (applying Nevada law). The conduct Plaintiff attributes to Ranger Zohovetz, checking handcuffs, telling a bystander she was "not coming out of" them, saying "well, then you are" when she said she had been told she was arrested, telling her the law required her name, and remarking that she could be cuffed in front if she would "chill out", is, at most, brusque. (ECF No. 37 at 14–15; Hoekstra Dep. 155:1–23.) It is not conduct "utterly intolerable in a civilized community," particularly where the same officer was simultaneously accommodating Plaintiff's request to have her handcuffs moved to the front. The threats to tase her and take her to the ground, the "arrest" statements, and the "prosecution" comment on which the IIED claim principally rests were all made by Deputy Boyer. (ECF No. 47 ¶¶ 31, 37, 80; Hoekstra Dep. 131:20–24, 177:1–7.) Finally, Plaintiff's distress evidence is directed to the detention as a whole, being handcuffed, threatened with a taser, and pulled by Deputy Boyer, not to anything Ranger Zohovetz did, (SUF ¶¶ 26–27; Hoekstra Dep. 120:21–25, 162:19–23, 163:13–19), and her pre-existing PTSD diagnosis and treatment pre-date the incident, (SUF ¶ 27). No reasonable jury could find that Ranger Zohovetz's conduct was extreme and outrageous or that it proximately caused severe emotional distress.

**F. Judgment Should Also Be Entered on the First Claim as to Ranger Zohovetz.**

The SAC re-pleads the Fourth Amendment claim against Ranger Zohovetz "solely to retain the claim for appeal." (ECF No. 47 at 9 n.8.) The Court dismissed that claim with prejudice. (ECF No. 45 at 15.) To avoid any ambiguity in the judgment, Ranger Zohovetz requests that the Court's order confirm that the First Claim is dismissed as to him for the reasons stated in ECF No. 45.

/ / /

/ / /

## VI. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendant Paul Zohovetz on the Second, Third, and Fourth Claims for Relief, confirm the prior dismissal of the First Claim as to him, and enter judgment in his favor.

Respectfully submitted this 14th day of October 2026.

TODD BLANCHE
Attorney General of the United States
SIGAL CHATTAH
First Assistant U.S. Attorney

*/s/ James R. Sweetin*
JAMES R. SWEETIN
Assistant United States Attorney
*Attorneys for Fed. Defendant Zohovetz*